**LAVACA BAY AUTOWORLD, L.L.C., Appellant,**

v.

**MARSHALL PONTIAC BUICK OLDSMOBILE, Appellee.**

**No. 13–02–00245–CV.**

Court of Appeals of Texas, Corpus Christi–Edinburg.

April 3, 2003.

Cynthia T. Sheppard, Cuero, John W. Griffin, Jr., Rebecca Rozmus, Houston, Marek & Griffin, for appellant.

Larry G. Hyden, Henkel, Hyden, Womble & Culbreth, Corpus Christi, for appellee.

Before Justices YAÑEZ, CASTILLO and GARZA.

## OPINION

Opinion by Justice GARZA.

### Introduction

Appellant, Lavaca Bay Autoworld, L.L.C. ("Lavaca Bay"), appeals from the 267th District Court's grant of summary judgment in favor of appellee, Marshall Pontiac Buick Oldsmobile, Inc. ("Marshall"). We reverse and render judgment for appellant.

### I. Background

This is a contract dispute arising from the sale of an automobile dealership. In September 2000, the parties agreed that Lavaca Bay would purchase Marshall's dealership in Port Lavaca, Texas. To that effect, they signed a document entitled "Asset Purchase Agreement Between Marshall Pontiac Buick Oldsmobile, Inc. and Lavaca Bay Autoworld, L.L.C." ("the Agreement"). At the same time, they also signed a document entitled "Lavaca Bay Autoworld–Marshall Auto Center Asset Purchase Agreement Schedule 2.1" ("the Worksheet"). The Worksheet lists the total purchase price Lavaca Bay paid for the dealership, as well as the individual prices for the various assets included in the sale. Lavaca Bay drafted both the Agreement and the Worksheet. It also calculated and recorded the prices written on the Worksheet.

After closing the deal, Lavaca Bay informed Marshall that it had miscalculated the final purchase price. Specifically, it claimed to have overpaid Marshall for the new cars included with the dealership. Marshall disagreed.

Marshall commenced the instant action, seeking a declaratory judgment that it "does not owe [Lavaca Bay] any other or further sums" under their contract. Lavaca Bay counterclaimed for declaratory judgment, breach of contract, fraud, mutual mistake, and mistake with inequitable conduct.

Both parties filed motions for summary judgment and no-evidence motions for

summary judgment, each asking the trial court to declare its interpretation of the Agreement to be correct. The trial court granted Marshall's motion for summary judgment. Lavaca Bay appeals the judgment.

We hold that Lavaca Bay is entitled to summary judgment on its claim for declaratory relief.

## II. Standard of Review

■ We review summary judgment decisions de novo. *Sasser v. Dantex Oil & Gas,* 906 S.W.2d 599, 602 (Tex.App.-San Antonio 1995, writ denied). When both sides move for summary judgment and the trial court grants one motion but denies the other, the reviewing court should review both sides' summary judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000). Here, both sides moved for traditional summary judgment and for no evidence summary judgment. The two forms of summary judgment are distinct and invoke different standards of review.

With respect to traditional summary judgments, the Texas Supreme Court has said:

> [T]he question on appeal ... is not whether the summary judgment proof raises [a] fact issue[,] ... but is whether the summary judgment proof establishes as a matter of law that there is no genuine issue of fact as to one or more of the essential elements of the plaintiff's cause of action.... [T]he judgment sought should be granted, and if granted should be affirmed, only if the summary judgment record establishes a right thereto as a matter of law.

*Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970).

■ We apply a different standard in reviewing no-evidence motions for summary judgment; we use the legal sufficiency standard applied to pre-trial directed verdicts. *Zapata v. Children's Clinic,* 997 S.W.2d 745, 747 (Tex.App.-Corpus Christi 1999, pet. denied). We review the evidence in the light most favorable to the non-movant, disregarding all contrary evidence and inferences. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995). If the non-movant produces evidence to raise a genuine issue of material fact, summary judgment is improper. Tex.R. Civ. P. 166a(i).

■ The common denominator between the traditional summary judgment standard of review and the no-evidence standard is that in either context, we review all summary judgment evidence on file to determine whether any fact issues remain for a jury to decide. *Brooks v. First Assembly of God Church of Cleburne,* 86 S.W.3d 793, 796 (Tex.App.-Waco 2002, pet. filed).

We agree with the parties that this case presents only a matter of contract interpretation. There are no genuine issues of material fact but solely legal issues for our review. Furthermore, since both parties argue that they are entitled to judgment as a matter of law but fail to specify which elements of their opponents' legal claims lack evidence, we review all of their arguments under the standard for traditional summary judgment. *Hamlett v. Holcomb,* 69 S.W.3d 816, 819 (Tex.App.-Corpus Christi 2002, no pet.) (holding that the parties' mere labeling of a motion for summary judgment as a no-evidence motion is not determinative and that where it is not readily apparent that the summary judgment motion is sought under Rule 166a(i), the reviewing court will presume that the

motion is filed under Rule 166a(c) and analyze it under the traditional summary judgment standard of review); *Michael v. Dyke,* 41 S.W.3d 746, 751 (Tex.App.-Corpus Christi 2001, no pet.) (same); *Oasis Oil Corp. v. Koch Ref. Co., L.P.,* 60 S.W.3d 248, 252 (Tex.App.-Corpus Christi 2001, pet. denied) (interpreting Rule 166a(i) to mean that a party moving for a no-evidence motion for summary judgment must fulfill certain specific requirements, including among other things: the motion must state the elements of the claim as to which there is no evidence; it must be specific in challenging the evidentiary support for a particular element of a claim; and it may not be conclusory or a general no-evidence challenge).

■ Because the trial court granted Marshall's motion for summary judgment without specifying the grounds for its ruling, the summary judgment will be upheld if any of the theories Marshall advanced are meritorious. *Oasis,* 60 S.W.3d at 255–56 (citing *State Farm Fire & Cas. Co. v. S.S. & G.W.,* 858 S.W.2d 374, 380 (Tex. 1993)).

### III. Analysis

Lavaca Bay claims it overpaid Marshall for the dealership's new vehicles, and Marshall insists that it did not. Both parties agree on the amount that Lavaca Bay actually tendered to Marshall in exchange for the dealership; they dispute whether the amount tendered was correct under the Agreement. Their respective claims thus depend on our interpretation of the terms of their contract, in particular, those of the Agreement and the Worksheet. We therefore begin our discussion with those documents.

The Agreement provides instructions for calculating the purchase price for the dealership. Section 3.1 says, "The consideration to be paid by Buyer to Seller for the Purchased Assets will be the cash consideration determined in accordance with Schedule 2.1 and Buyer's assumption of the Lease Agreements less Floor Plan amounts."

Notably, there are two different "Schedule 2.1's." Page 17 of the Agreement is titled "Schedule 2.1." The Worksheet is also titled "Schedule 2.1." For simplicity, we will refer to page 17 of the Agreement as "the Formulas" because it recites specific formulas for calculating the price of each asset included in the sale.

The Worksheet and the Formulas work in tandem. The Worksheet provides a blank space for each of the prices derived using the Formulas. The Worksheet also provides a total purchase price for the entire dealership, which is calculated by adding the individual prices derived using the Formulas. Other than the instructions given by the Formulas, the Agreement is silent on how to complete the Worksheet.

### The Worksheet's Price

The Worksheet indicates that Lavaca Bay paid "zero" dollars for Marshall's inventory of new cars. According to Lavaca Bay, the selling price should have been negative. It argues that under the Agreement, it should have received credit for the holdbacks Marshall received from the manufacturer. Lavaca Bay claims it paid too much because the holdbacks were not deducted from the final price. Marshall maintains that Lavaca Bay did not overpay.

### The Formulas' Price

We turn to the Formulas. Under the heading "New Vehicles," the Formulas state, "All New Vehicles will be purchased by Buyer from Seller at Dealer Net Cost less any Cost of Repair less Floor Plan amount." Thus, the three variables that

determine the purchase price for new vehicles are: (1) Dealer Net Cost; (2) Cost of Repair; and (3) Floor Plan amount. The Agreement defines all three variables.

"Dealer Net Cost" approximates the actual expense incurred by the dealer in acquiring a new car. Article I of the Agreement explains that "Dealer Net Cost" equals "the price for an item originally invoiced to Seller by manufacturer, the actual cost of freight, handling and dealer installed accessories and conversions, *less holdback*, invoiced advertising and insurance and less any and all applicable incentives...." (emphasis added). "Cost of Repair" is defined as "the actual cost to the Dealership to repair any damage to any vehicle...." The "Floor Plan" is the "money owed by Seller to any financial institution holding a security interest in any vehicle." It is the money a dealer borrows to acquire new cars.

To recap, the Formulas say that the purchase price for new automobiles is "Dealer Net Cost less any Cost of Repair less Floor Plan Amount."

## Holdbacks

Both parties agree that this dispute concerns the proper treatment of manufacturer holdbacks under the Agreement. A holdback is a percentage of the Manufac-

turer's Suggested Retail Price (MSRP) that a car dealer collects from the manufacturer.[1] The holdbacks for the new cars sold with the Marshall dealership totaled $30,311.94. Marshall retained this sum. Although Lavaca Bay assumed responsibility for the Floor Plan Amounts, that is, the loans used to acquire the new cars, Marshall kept the manufacturer holdbacks. Both parties agree that the Agreement excluded the holdbacks from the deal.

Lavaca Bay, however, claims that it inadvertently failed to subtract the holdbacks when it calculated the prices of the new vehicles. Essentially, Lavaca Bay claims to have unintentionally paid for the holdbacks. It asserts that Marshall thus got the holdback amounts twice: once from General Motors Corporation and once from Lavaca Bay.

Marshall argues that it is entitled to the holdbacks. Lavaca Bay responds that even though Marshall is entitled to them, it nevertheless collected a higher purchase price than that specified by the Formulas. The alleged overpayment equals the holdback amounts that Lavaca Bay failed to subtract from the price of the new cars.

The trial court agreed with Marshall. It declared, "The contract between ... [Marshall and Lavaca Bay] provided that ... [Marshall] was entitled to keep and retain

---

1. Holdbacks are typically 2–3% of the MSRP, and they appear on the factory invoice next to other common fees such as the destination and dealer advertising charges. Holdbacks ensure that even dealers who sell their new cars at dealer invoice cost have an opportunity to profit on their sales. They work as follows.

When a dealer orders a car from the factory, it typically will finance the purchase through the car manufacturer. This inventory financing creates interest expense for the dealership. The longer a new car sits on the dealership's lot, the more interest the dealer must pay. The dealership must also bear all the risks and costs of maintaining its invento-

ry, insuring the lot, staffing the dealership, and, most importantly, selling the cars.

To help with these expenses and to make inventory acquisition less financially cumbersome for dealerships, car manufacturers pay the financing expenses for approximately the first six months that a dealership holds its new cars. Occasionally, the manufacturers also chip in on the dealership's maintenance expenses. Either way, the payment is made in a lump sum, which is predetermined by the manufacturer and paid on a quarterly basis. This is the holdback, and the dealership is entitled to receive it even if a new car is sold the same day it arrives on the lot.

the 'holdback' sums in the amount of $30,311.94.... [Lavaca Bay] is not entitled to recover the 'holdback' or any other sums from ... [Marshall]."

### Issues Presented

The issues before this Court are: (1) whether Marshall or Lavaca Bay is entitled to the "holdback" amounts under the Agreement; (2) whether Lavaca Bay overpaid Marshall under the terms of the Agreement; and (3) whether Lavaca Bay can recover any money from Marshall.

### 1.

■ We conclude that under the terms of the Agreement, Marshall did not sell any holdback payments to Lavaca Bay. The Agreement specifies which assets are included in the sale of the dealership and which are excluded. Section 2.2 states, "Only the Purchased Assets are being sold to Buyer by Seller pursuant to this Agreement and no Excluded Assets are subject to the purchase and sale contemplated by this Agreement." Article 1, in turn, defines "Excluded Assets." They are "cash on hand or on deposit, accounts with any financial institution, accounts receivable, notes receivable, *hold back payments* due Seller from Franchisor as of the Closing Date...." (emphasis added).

This Court cannot find (and the parties do not cite) any language in the Agreement that indicates that Lavaca Bay was buying the holdback payments from Marshall. Furthermore, the parties agree that they never even discussed holdbacks prior to signing the Agreement and the Worksheet. Those documents do not say that Lavaca Bay was buying them. We therefore agree with the trial court's conclusion that under the terms of the Agreement Marshall is entitled to retain the holdbacks.

### 2.

■ Nevertheless, Lavaca Bay claims Marshall overcharged it for the new cars. The Agreement specifies that the holdback be subtracted from the "Dealer Invoice Amount" to arrive at "Dealer Net Cost," which is then used to calculate the purchase price for a new car. Lavaca Bay asserts that it inadvertently failed to subtract the holdback amounts, causing the actual purchase price for the new cars to exceed the contract price by an amount equal to the holdback payments. Marshall contends that it is entitled to the holdback amounts and that Lavaca Bay did not overpay.

We agree with Lavaca Bay. As we have already concluded, the Agreement allows Marshall to keep the holdbacks. Even so, Marshall collected more money from Lavaca Bay than the Agreement provided. Lavaca Bay paid for the holdbacks that the parties agreed Marshall would retain.

The Agreement supports Lavaca Bay's position. Section 3.1 says, "The consideration to be paid by Buyer to Seller for the Purchased Assets will be the cash consideration determined in accordance with Schedule 2.1...." In relevant part, the Formulas read, "All new cars will be purchased by Buyer from Seller at Dealer Net Cost less any Cost of Repair less Floor Plan Amount." Article 1 of the Agreement defines "Dealer Net Cost." It is "the price for an item originally invoiced to Seller by manufacturer ... less *holdback...*" (emphasis added). Thus, the Agreement unambiguously instructs the parties to subtract the holdback amount from the selling price.

Marshall admits that the final selling price it received from Lavaca Bay included the cost of the holdbacks. We therefore conclude that Lavaca Bay paid more mon-

ey to Marshall than the Formulas required.

Still, according to the terms of the Agreement, the Worksheet became part of the Agreement when the parties signed it. Consequently, we have two directly conflicting provisions in the same contract. The Worksheet says the sales price for the new cars is zero, whereas the Formulas say that the price is negative $30,311.94.

The parties agree that they never discussed the holdbacks prior to executing the Agreement and the Worksheet. They also agree that Lavaca Bay completed the Worksheet and that Lavaca Bay calculated the final selling price written on the Worksheet. The question before this Court is which price prevails.

■ The primary concern of the courts in construing contracts is to ascertain and give effect to the parties' intentions as expressed in their writings. *Lenape Res. Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex.1996) (citing *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983)). Although the parties in this case may have had conflicting intentions, at least regarding the holdbacks, in construing their contract, we look to their objective intent as manifested in their writings and not their subjective intent. In doing so, we cannot reconcile the conflicting price provisions.

■ To determine which price governs the Agreement, we must turn to the rules of contract interpretation. They favor validity and instruct us to examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 158 (1951). No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole

instrument. *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962); *Citizens Nat'l Bank in Abilene v. Texas & P. Ry. Co.,* 136 Tex. 333, 150 S.W.2d 1003, 1006 (1941).

■ Returning to the Agreement, two different provisions indicate that the holdback payments were to be subtracted from the purchase price. First, Section 2.2 excludes holdbacks from the deal. It reads, "Only the Purchased Assets are being sold to Buyer·by Seller pursuant to this Agreement and no Excluded Assets are subject to the purchase and sale contemplated by this Agreement." Article 1 defines "Excluded Assets" as "cash on hand or on deposit, accounts with any financial institution, accounts receivable, notes receivable, *hold back payments* due Seller from Franchisor as of the Closing Date . . . ." (emphasis added).

Second, by using "Dealer Net Cost" as the basis of the price for new vehicles, the Formulas establish that holdbacks should have been subtracted from the final purchase price. After all, "Dealer Net Cost" is "the price for an item . . . invoiced to Seller . . . *less holdback.*" (emphasis added).

In sum, two independent provisions of the Agreement state that the holdback amounts were to be deducted from the purchase price, and no language in any of the documents indicates that Lavaca Bay was to pay for them.

The Worksheet is the only writing that supports Marshall's argument that it is entitled to the holdbacks and that Lavaca Bay must also pay for them. Without explanation, it lists a price that both parties agree includes the holdback amounts. Marshall's entire argument rests on a single number, a zero.

Marshall argues that the price listed on the Worksheet, the zero, trumps the other

two provisions of the Agreement, which together yield a negative price. It attempts to buttress this contention with three different parts of the Agreement. We disagree with Marshall's reading of all three provisions.

First, Marshall cites Paragraph 2.1, which states, "The allocation of the consideration for the purchased assets as set forth on Schedule 2.1 will be conclusive and binding for all purposes...." Marshall reads this language to mean that the numbers written on the Worksheet control over any conflicting contract provisions, specifically, the Formulas.

The language, however, is susceptible to more than one interpretation. It also can be read to mean that the Formulas preempt any other allocation of the purchase price, even the prices recorded on the Worksheet. After all, both the Formulas and the Worksheet are formally titled "Schedule 2.1." Paragraph 2.1 could be referring to either document. A third reading of the language is that it refers concurrently to both the Formulas and the Worksheet. If so, both documents would be the conclusive allocation of the consideration.

The provision before us can be read three different ways but has only one reasonable meaning. We conclude that the language in Paragraph 2.1 refers to both the Worksheet and the Formulas. The two documents were not intended to conflict. The prices calculated using the Formulas were intended to be (and were in fact) recorded on the Worksheet. Understandably, then, the Agreement does not give particular weight to either document but simply refers to them collectively as "Schedule 2.1." We disagree with Marshall's contention that the language of Paragraph 2.1 elevates the Worksheet above the Formulas.

Second, Marshall uses the definition of "Purchase Price," found in Paragraph 3.1 of the Agreement, to support its argument that the price written on the Worksheet trumps the Formulas. That language reads, "The consideration to be paid by Buyer to Seller for the purchased assets will be the cash consideration determined in accordance with Schedule 2.1." For the same reasons supporting our conclusion regarding the language of Paragraph 2.1, we conclude that the definition of "Purchase Price" gives both the Formulas and the Worksheet equal weight and does not favor one over the other.

The third provision Marshall relies on to establish the superiority of the Worksheet's price is entitled "Entire Agreement: Amendment." It states:

This agreement, the related agreements and *schedules*, exhibits and attachments to such agreements contain the entire agreement of the parties with respect to the purchase and sale of the purchased assets. This agreement may be amended only by an instrument in writing signed by the parties.

(emphasis added). Marshall argues that the Worksheet amended the Agreement, superseding the Formulas. We disagree.

The Worksheet did not amend the Agreement but rather became part of the original deal. Paragraph 10.6 of the Agreement explains:

Each and every *schedule or exhibit referred to in and/or attached to this Agreement* or referred to in and/or attached to another schedule or exhibit to this agreement is hereby incorporated by reference for all purposes as fully as if such exhibit, and all of its contents, had been repeated verbatim in the body of this Agreement.

(emphasis added). The Worksheet is a "schedule." It was attached to the Agreement, and as Marshall points out, the

Agreement refers to the Worksheet in two different places: under the headings "Purchased Assets" and "Purchase Price." Thus, the Worksheet did not amend the Agreement but was incorporated into it as if the Worksheet "had been repeated verbatim in the body" of the Agreement.

In sum, we find Marshall's arguments unpersuasive because they each rest on the same single digit, a zero. Lavaca Bay's arguments, in contrast, are supported throughout the Agreement. Marshall asks us to ignore two elaborate price provisions in favor of the zero written on the Worksheet. To do so would violate the Texas Supreme Court's admonition that "no single provision taken alone will be given controlling effect ... [and that] all ... provisions must be considered with reference to the whole instrument." *Coker*, 650 S.W.2d at 393 (citing *Myers*, 361 S.W.2d at 196); *Citizens Nat'l Bank*, 150 S.W.2d at 1006 (Tex.1941). We agree with Lavaca Bay and, accordingly, reject Marshall's arguments.

■ The rules of contract interpretation support our conclusion. First, terms stated earlier in the contract are favored over conflicting terms recited later in the document. *Coker*, 650 S.W.2d at 393 (citing *Ogden v. Dickinson State Bank*, 26 Tex. Sup.Ct. J. 200, 202 (Tex.1983), *withdrawn, aff'd on reh'g*, 662 S.W.2d 330 (Tex. 1983)). Here, Lavaca Bay's terms come before Marshall's.

■ Second, when differences exist between terms in the same instrument, those that contribute most essentially to the agreement are entitled to greater consideration. *Caranas v. Morgan Hosts–Harry Hines Blvd., Inc.*, 460 S.W.2d 225, 228 (Tex.Civ.App.-Dallas 1970, no writ) (approving the rule as stated in 13 Tex. Jur.2d, Contracts, § 142). In this case, Lavaca Bay's terms contribute more essentially to the contract than Marshall's.

The Formulas explicitly instruct the parties on how to determine the purchase price for each new car. Marshall's only term is a zero. As a price, it is necessarily less fundamental to the contract than the Formulas, which the parties agreed would determine all prices in the transaction.

Finally, and perhaps most importantly, a single contract provision may not be interpreted so as to destroy and contradict other express provisions and the whole tenor and effect of the parties' contract. *Priem v. Shires*, 697 S.W.2d 860, 865 (Tex. App.-Austin 1985, no writ) (citing *Coker*, 650 S.W.2d at 393). Marshall invites our Court to violate this rule. It asks us to use a zero to not only contradict but to destroy the Formulas and their express effect on the Agreement. We refuse.

When portions of a contract cannot be reconciled, a court may resolve the conflict by striking down one of the provisions. *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex.1983) (citing *Woods v. Sims*, 154 Tex. 59, 273 S.W.2d 617 (1954)); *Henry v. Gonzalez*, 18 S.W.3d 684, 688 (Tex.App.-San Antonio 2000, pet. dism'd by agr.) (striking down an irreconcilable contract provision). For the reasons stated above, we strike down the zero written on the Worksheet and conclude that the contract price does not include the holdback sums. Lavaca Bay overpaid Marshall by $30,311.94. Insofar as the trial court's judgment holds that Lavaca Bay did not overpay Marshall according to their Agreement, we reverse and render judgment for Lavaca Bay.

**3.**

The final issue before us is whether Lavaca Bay can recover its overpayment from Marshall. The Uniform Declaratory Judgment Act ("the Act") grants us au-

thority to declare the parties' rights. That power is sufficient to resolve their dispute.

 Section 1 of the Act gives "courts of record ... the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." TEX. CIV. PRAC. & REM.CODE ANN. § 37.001 (Vernon 1997). The Act's stated purpose is "to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." *Id.* at § 37.002(b); *Bonham State Bank v. Beadle,* 907 S.W.2d 465, 467 (Tex.1995). As applied to contracts, the purpose of declaratory relief is to obtain an interpretation of the contract. *Emmco Ins. Co. v. Burrows,* 419 S.W.2d 665, 670 (Tex.Civ. App.-Tyler 1967, no writ). Here, a judicial declaration of the parties' rights and obligations under their contract would resolve the entire controversy. Declaratory relief is therefore appropriate. *Board of Water Eng'rs v. City of San Antonio,* 155 Tex. 111, 283 S.W.2d 722, 724 (1955); *Public Util. Comm'n v. City of Austin,* 728 S.W.2d 907, 911 (Tex.App.-Austin 1987, writ ref'd n.r.e.).

 In its original petition, Marshall asked the trial court to "determine and declare ... [its] rights and entitlements ... under and pursuant to the ... contract, including but not limited to, the determination and declaration that ... it does not owe ... [Lavaca Bay] any other or further sums." Lavaca Bay's motion for summary judgment, in contrast, asked the trial court to declare "as a matter of law that Marshall does indeed owe Lavaca Bay additional monies ... in the amount of $30,311.94." The trial court granted Marshall's motion for summary judgment and declared, "The contract between ... [Marshall and Lavaca Bay] provided that ... [Marshall] was entitled to keep and retain the 'holdback' sums in the amount of $30,311.90. [Lavaca Bay] is not entitled to

recover the 'holdback' or any other sums from ... [Marshall]."

We reverse the trial court's judgment and hold that Lavaca Bay is entitled to summary judgment. Marshall owes Lavaca Bay $30,311.94 for its overpayment, and in addition, we grant Lavaca Bay's request to recover reasonable attorney's fees from Marshall in the amount of $8,607.00. TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997).

Having resolved the parties' dispute in Lavaca Bay's favor, we do not address Lavaca Bay's remaining theories of recovery.