**GREATER HOUSTON RADIATION ONCOLOGY, P.A., Oncology Management Services, L.P., and Oncology Reimbursement Services, L.P., Appellants,**

v.

**SADLER CLINIC ASSOCIATION, P.A., Appellee.**

No. 09–11–00460–CV.

Court of Appeals of Texas, Beaumont.

Submitted March 29, 2012.

Decided Oct. 4, 2012.

S. Shawn Stephens, Michael W. Mengis, Baker & Hostetler LLP, Houston, for appellants/cross appellee.

Robert M. O'Boyle, Tiffany Hildreth, Strasburger & Price, LLP, Austin, for appellee/cross appellant.

Before McKEITHEN, C.J., GAULTNEY and KREGER, JJ.

## OPINION

CHARLES KREGER, Justice.

This is an appeal from a judgment rendered after a jury verdict that awarded Sadler Clinic Association, P.A. tort damages in the amount of $307,935 and Oncology Reimbursement Services, L.P. contract damages in the amount of $57,583. Sadler Clinic Association, P.A., Greater Houston Radiation Oncology, P.A., and Oncology

Management Services, L.P. were awarded no damages on their breach of contract claims. In multiple issues, appellants contend the trial court erred in construing the Professional Services Agreement, in its charge of the issues to the jury, and in awarding attorneys' fees. We reverse and remand in part and affirm in part.

## I. BACKGROUND

In 2007, Sadler Clinic Association, P.A., began talking with Dr. Kirk Kanady about developing a radiation oncology center. Kanady had been involved in the establishment of several radiation oncology centers in the Houston area. In 2008, Sadler began the process of developing its radiation oncology center. On July 14, 2008, Sadler entered into three agreements to provide for the operation, maintenance, and professional service of its radiation oncology center. Sadler signed (1) a professional services agreement with Greater Houston Radiation Oncology, P.A., ("GHRO"), a physician group of radiation oncologists, (2) a billing and collection services agreement with Oncology Reimbursement Services, L.P. ("ORS"), and (3) a management services agreement with Oncology Management Services, L.P. ("OMS"). On July 18, 2008, Kanady signed all three agreements as president of all three companies (hereinafter referred to collectively as the "Kanady entities").

The facility for Sadler's radiation oncology clinic was not complete when Sadler initially entered into the agreements with Kanady. So that GHRO physicians could begin treating Sadler patients, Sadler signed a lease agreement with another clinic, Northwoods Urology ("Vision Park"),[1] which was already set up for providing radiation oncology services. The first patient was seen at Vision Park on August 28, 2008. The Kanady entities provided services at Vision Park under the parameters of their agreements with Sadler. Cuong ("Chris") Phan was the primary GHRO physician who provided radiation oncology services pursuant to the professional services agreement ("PSA") at Vision Park. Because the GHRO physicians were not yet credentialed under Sadler's tax identification number,[2] the parties agreed that ORS would begin billing under GHRO's tax identification number, collect the payments, and then turn the collected funds over to Sadler. Sadler would then, in turn, pay GHRO, OMS, and ORS pursuant to the terms of the agreements.

Sadler's radiation oncology center, located at Sadler's clinic ("Pinecroft")[3] was completed and the first patient was seen at Pinecroft on February 5, 2009. At that time, the center had only one Linear Accelerator.[4] Chris Phan's brother, Thinh Phan ("T. Phan"), was the primary GHRO physician who provided radiation oncology services at Pinecroft pursuant to the PSA. Shortly after the Pinecroft clinic opened, T. Phan was introduced to Dr. Jason Beril-

1. Northwoods Urology was located at 135 Vision Park Boulevard, The Woodlands, Texas and is referred to by the parties throughout the trial as the Vision Park location.

2. Sadler's Chief Financial Officer, Robert Branstetter testified at trial that Sadler knew it would take four to six months to have GHRO's physicians credentialed under Sadler's tax identification number. Additionally, the evidence established that the agreement to allow ORS to begin billing using GHRO's tax identification number was made while the contracts were still being negotiated.

3. The radiation oncology center at Sadler Clinic was located at 9305 Pinecroft Drive, The Woodlands, Texas and is referred to by the parties throughout the trial as the Pinecroft location.

4. A Linear Accelerator machine is used for external beam radiation treatments, which is the cancer treatment commonly referred to as "radiation."

gen, another radiation oncologist, who was touring Sadler's Pinecroft radiation oncology center with Sadler's chief operating officer. At trial, the evidence was disputed regarding the purpose of Berilgen's initial visit to the facility. T. Phan testified that when he was introduced to Berilgen at Pinecroft, Berilgen stated to him that he was interviewing for the radiation oncologist position. Berilgen testified that he requested a tour of the facility because he was considering opening his own radiation oncology center. Robert Branstetter, Sadler's chief financial officer, testified that Berilgen visited at the request of another Sadler physician who thought Berilgen would enjoy touring the facility. Though Berilgen admitted at trial that he was interested in employment with Sadler, he testified that he knew nothing was available at that time.

T. Phan discussed Berilgen's visit with Branstetter to inquire as to whether there was a problem with his performance at Pinecroft, and Branstetter assured him that he was doing well and the physicians were pleased with his performance. Kanady also discussed the incident with Branstetter who assured Kanady that Berilgen was only at Sadler on a "courtesy visit," that Sadler was happy with T. Phan, that Sadler was committed to its relationship with the Kanady entities, and that Sadler was not attempting to hire a new radiation oncologist.

Shortly after Berilgen's visit to the facility, Kanady proposed an amendment to the PSA that extended the contract term for ten years and increased the monetary penalty for early termination. Kanady sent an email to Branstetter in early March 2009 and attached the proposed amendment to the PSA. Kanady's email stated, "I am not doubting you when you told me that you have no intention of changing billing, management or professional services with us, but I am not so certain about others in your organization." Sadler's Management Board[5] declined to accept Kanady's proposed amendment because the term was too long. In April 2009, Kanady proposed a five year extension to the PSA. The Board declined to accept Kanady's proposed five year extension. Branstetter testified that during this time, he received frequent phone calls from Berilgen expressing his interest in practicing radiation oncology at Pinecroft.

In June 2009, the Board began discussing hiring its own radiation oncologist. One of the Board members suggested asking Berilgen if he was still interested in a position with Sadler. Branstetter testified at trial that Sadler and Kanady had experienced some "rocky patches," particularly regarding matters related to the billing and collections agreement ("Billing Agreement") with ORS. Branstetter testified he was concerned that Kanady would decide to leave and leave Sadler's clinic without a radiation oncologist. In July 2009, the Board hired Berilgen to provide radiation oncology services at Sadler's Pinecroft radiation oncology center. His official title was medical director of the center. T. Phan testified that prior to Sadler hiring Berilgen, he believed he was the director of the radiation oncology center at Sadler. T. Phan testified that at the time Berilgen was hired, Phan was seeing roughly thirty patients a day in the center. Phan and Kanady both testified that this patient load did not necessitate another radiation oncologist. On July 20, 2009, GHRO's attorney sent Sadler a demand letter that stated Sadler was in breach of the PSA and gave

5. Sadler's Management Board is called The Montgomery County Management Company Board of Managers.

Sadler 15 days to terminate or reassign Berilgen or face potential legal action.

The evidence established that after Berilgen was hired, the referrals from Sadler physicians to T. Phan dropped quickly. Phan testified that by the third or fourth week, his referrals had dropped by more than seventy-five percent. Though Berilgen was paid a yearly salary by Sadler, the PSA was structured such that GHRO was compensated for its physicians' services based on collections attributable to the services they provided. If T. Phan did not see patients, GHRO was not compensated. T. Phan testified that in addition to his referrals drying up, one of his patients was "redirected" to see Berilgen by one of the Sadler physicians. When T. Phan confronted the Sadler physician, he was told, " 'It has nothing to do with you, it's business.' " T. Phan testified that eventually Sadler physicians quit sending him patients. T. Phan continued to treat all of his Sadler patients through the end of their treatment. T. Phan saw his last patient at Sadler in October 2009.

On August 13, 2009, Sadler sent OMS written notice that it was terminating the Management Agreement, together with a check for the amount of liquidated damages set forth in the agreement. The following day, Sadler gave ORS written notice that it was in breach of the Billing Agreement and gave ORS thirty days to cure the alleged breaches. Sadler ceased processing reimbursement claims through ORS on August 17, 2009. Sadler declined to terminate Berilgen. On September 1, 2009, Sadler filed a declaratory judgment action seeking a declaration that the PSA was not an exclusive contract and Sadler was entitled to hire non-GHRO radiation oncologists. GHRO, OMS, and ORS filed a counterclaim against Sadler. Each entity alleged that Sadler breached its respective agreement. Additionally, OMS sought a declaratory judgment that the Manage-

ment Agreement could only be terminated for cause and was still in effect. Sadler terminated the PSA and Billing Agreement on October 9, 2009. Thereafter, Sadler amended its petition and alleged that GHRO, ORS, and OMS breached their agreements with Sadler.

The jury awarded Sadler $307,935 for GHRO's failure "to turn over funds collected on Sadler's behalf[.]" The jury found that both Sadler and ORS failed to comply with the Billing Agreement but found that ORS's breach of the agreement was excused. The jury awarded ORS $57,583 for Sadler's breach. The jury concluded that GHRO failed to comply with the PSA but found that Sadler was not entitled to any damages. The jury awarded both Sadler and appellants $500,000 each in attorneys' fees, however, the trial court's judgment only awarded attorneys' fees to Sadler. The court's judgment ordered that Sadler recover $500,000 in attorneys' fees from GHRO, ORS, and OMS.

GHRO, OMS, and ORS appealed the trial court's judgment. In eleven issues, appellants argue: (1) GHRO is entitled to damages under the PSA because it is an exclusive contract as a matter of law, (2) the trial court erred in failing to declare that Sadler breached the Management Agreement and the PSA, (3) the trial court committed multiple errors in charging the jury, and (4) the trial court erred in awarding attorneys' fees to Sadler and refusing to award attorneys' fees to ORS. Sadler asserts two cross-points on appeal arguing that the trial court erred in refusing to submit jury questions regarding breach of fiduciary duty and civil conspiracy.

## II. THE PROFESSIONAL SERVICES AGREEMENT

In the jury charge, the trial court instructed the jury that "the [c]ourt has found that the language of the Professional

Services Agreement is not ambiguous and that the contract is not awarding GHRO an exclusive contract to provide oncology patient services to Sadler." Appellants contend this finding and instruction was error. Appellants argue that the plain language of the agreement establishes that GHRO was to be the exclusive provider of radiation services at Pinecroft. Additionally, appellants assert that the trial court's construction of the agreement is unreasonable and renders the agreement unenforceable for lack of mutuality.

We review a trial court's construction of an unambiguous contract de novo. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex.1999). In construing a written contract, our primary concern is to ascertain the true intention of the parties as expressed in the written instrument. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex.2005); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). We presume that the parties intended every clause to have some effect and consider the entire writing in an effort to harmonize and give effect to every provision of the agreement so that no provision is rendered meaningless. *Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex.2010); *Coker*, 650 S.W.2d at 393; *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 627 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). No single provision may be taken alone and given controlling effect. *Hicks v. Castille*, 313 S.W.3d 874, 879–80 (Tex.App.-Amarillo 2010, pet. denied); *Coker*, 650 S.W.2d at 393. We will give the contract terms their plain and generally accepted meaning unless the contract shows the parties intended to use them in another manner. *XCO Prod. Co.*, 194 S.W.3d at 627. We will determine how a reasonable person would have understood the contract language, keeping in mind the circum-

stances surrounding the contract's negotiation and the parties' intended purpose in executing the agreement. *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 500 (Tex.App.-Houston [14th Dist.] 2007, pet. denied).

If the language of a written instrument can be given a certain or definite legal meaning, then it is not ambiguous and the court will construe the agreement as a matter of law. *Coker*, 650 S.W.2d at 393. Lack of clarity does not render a contract ambiguous. *XCO Prod. Co.*, 194 S.W.3d at 627. Further, a contract is not ambiguous merely because the parties advance conflicting interpretations of the agreement. *Id.* A contract is ambiguous when it is subject to two or more reasonable interpretations after applying the pertinent rules of construction. *Id.* "Whether a contract is ambiguous is a question of law for the court[.]" *Coker*, 650 S.W.2d at 394. When a contract is ambiguous, interpretation of the agreement becomes a fact issue for the jury, to be resolved by extrinsic evidence. *Coker*, 650 S.W.2d at 394. The trial court found that the PSA was not ambiguous. None of the parties contend on appeal that the PSA is ambiguous. We now turn to the language in the agreement.

A. Construction of the Agreement

The PSA provides in pertinent part:

NOW THEREFORE, for and in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. *Engagement.* Practice Group hereby engages Provider, and Provider hereby accepts such engagement, *to provide those professional radiation oncology services necessary to operate the Center,* and such other medical-adminis-

trative services as are required to be provided by physicians in order for the Center to operate under the laws and regulations of the State of Texas. (Emphasis added).

Under the terms of the PSA, GHRO is the "Provider." "Provider Physicians" are defined as "those physicians who are designated by Provider and approved by Practice Group to provide services on behalf of Provider pursuant to this Agreement." "Practice Group" is the Sadler Clinic Association. The PSA only authorizes GHRO to use the radiation center to fulfill its obligations under the agreement. The PSA gives Sadler the exclusive right to collect fees for services rendered by GHRO at the center, and obligates Sadler to compensate GHRO monthly, based on collections attributable to the services GHRO provides to patients. The initial contract term is for a period of one year after the date the center opens. The PSA states that the agreement "shall automatically renew for successive one (1) year terms unless either party shall deliver to the other party, at least one hundred twenty (120) days prior to the end of the then current term, written notice of non-renewal." The agreement further provides in pertinent part:

12. *Termination.*

(a) Either party shall have the right, in its sole and absolute discretion, to immediately terminate this Agreement if a breach of any of the material terms of this Agreement by the other party occurs, which breach is not cured or remedied within fifteen (15) days after delivery of written notice to the other party specifying the nature of the breach; provided however that if the nature of the breach is such that more than fifteen (15) days are required for its cure and remedy and if the breaching party commences such cure within the initial fifteen (15) day period and thereafter diligently prosecutes such cure to completion, then the non-breaching party shall have the right to immediately terminate this Agreement only if the breach is not cured or remedied within thirty (30) days following the delivery of written notice specifying the nature of the breach....

. . . .

(e) The payment provisions of this Agreement may not be altered or modified during any single one-year term of this Agreement. Following termination of this Agreement without cause, the parties hereto shall not enter into the same or a similar independent contractor arrangement with each other unless the new arrangement does not have the effect of altering or modifying the previous Agreement's payment provisions within the previous 12–month period. The intent of this Section 12(e) is to prohibit Provider and Practice Group from terminating this Agreement without cause and entering into a new arrangement in order to alter or modify the payment provisions within a period of less than one (1) year.

. . . .

17. *Entire Agreement: Counterparts.* This Agreement supersedes all previous contracts and constitutes the entire agreement between the parties in connection with the subject matter hereof. Neither party hereto shall be entitled to benefits other than those specified herein. No oral statements or prior written material not specifically incorporated herein shall be of any force and effect, and no changes in or additions to this Agreement shall be recognized....

Appellants contend that the "necessary to operate" language in the engagement paragraph quoted above, establishes an exclusive-provider contract between Sadler and GHRO. Sadler contends that the absence of specific exclusivity provision relat-

ed to professional services and the express language of another contract provision renders the agreement non-exclusive. Sadler points to the language set forth later in the agreement, which states:

26. *No Referral Obligation.* Provider and Practice Group expressly acknowledge and agree that nothing contained in this Agreement shall require either party hereto to refer (or influence the referral of) any patients to, or order any goods or services from, the other party or any affiliated entity. Notwithstanding any unanticipated effect of any provision of this Agreement, neither party shall knowingly or intentionally conduct itself in such a manner as to violate the provisions against fraud and abuse in connection with the Medicare and Medicaid programs (42 U.S.C. § 1320a–7b).

Sadler contends that pursuant to this paragraph, Sadler was "not 'required' to obtain anything from GHRO."

 We do not view the contract's provisions in isolation but construe it as a whole. *Baty v. ProTech Ins. Agency,* 63 S.W.3d 841, 848 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (op. on reh'g). We will consider how a reasonable person would have understood the contract language in light of the circumstances that existed when the contract was executed and the purpose to be achieved by the contracting parties. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981); *7979 Airport Garage,* 245 S.W.3d at 500; *Baty,* 63 S.W.3d at 848. Sadler relies on the fact that Branstetter and Kanady both testified that the issue of whether the PSA was exclusive was never specifically raised during negotiations. We consider this fact in light of the contract's language and the other relevant circumstances bearing on the parties' intent. *See Cook Composites, Inc. v. Westlake Styrene Corp.,* 15 S.W.3d

124, 132 (Tex.App.-Houston [14th Dist.] 2000, pet. dism'd).

The PSA obligates GHRO to provide professional radiation oncology services as "necessary to operate the [c]enter, and such other medical-administrative services as are required to. be provided by physicians" to comply with State law. Under the plain language of this paragraph, GHRO was obligated to provide enough radiation oncologists to meet the center's needs. To that end, the agreement contemplated the potential designation of multiple physicians by GHRO, subject to Sadler's approval. The agreement was also structured such that GHRO's compensation was dependent on the revenue it brought in by the performance of its services. Additionally, we note that Sadler's radiation oncology center was a new endeavor for Sadler. At the time of the execution of the contract, the center had not yet opened for business. Sadler simultaneously negotiated and executed agreements with OMS and ORS to provide the management and billing services necessary to operate the center. The PSA was not an agreement for a single physician to join an established practice with an existing patient base. It was an agreement with a physician group to meet the professional service needs of the center for at least its first year of operation.

 We recognize that on its face, the "No Referral" paragraph states that Sadler is not required to "order any goods or services from" GHRO. Nevertheless, Texas law generally mandates that one contract provision not be interpreted in a way that nullifies another provision. *See Burnett Ranches, Ltd. v. Cano Petroleum, Inc.,* 289 S.W.3d 862, 867 (Tex.App.-Amarillo 2009, pet. denied); *Lavaca Bay Autoworld v. Marshall Pontiac Buick Oldsmobile,* 103 S.W.3d 650, 659 (Tex.App.-Corpus Christi 2003, pet. dism'd). Additionally,

when harmonizing a contract's terms, the terms set forth earlier in the contract are favored over terms set forth later in the instrument. *Coker*, 650 S.W.2d at 393; *Nevarez v. Ehrlich*, 296 S.W.3d 738, 742 (Tex.App.-El Paso 2009, no pet.). When differences exist between terms in an agreement, terms that are most essential to the contract are given greater consideration. *Lavaca Bay Autoworld*, 103 S.W.3d at 659. Under these rules of construction, the engagement paragraph on the first page of the agreement should be given more weight than the No Referral paragraph on the last page. The No Referral provision cites the federal anti-kickback statute, which prohibits certain types of referral relationships in the healthcare industry. *See* 42 U.S.C.A. § 1320a–7b. Therefore, we presume this provision was placed in the agreement in an effort to ensure the parties' compliance with federal law.

■ In effect, paragraph 26 provides that Sadler is not required to refer its patients in-house, to GHRO's physicians.[6] This paragraph does not address which physicians will provide radiation oncology services at Sadler's center. Paragraph 26 does not conflict with the engagement provision of the PSA—while Sadler may not have been obligated or required to send patients to its radiation oncology center, it was obligated pursuant to the engagement provision of the PSA to allow GHRO to treat the patients that were sent there.

Appellants cite *Cardiovascular Servs. Inc. v. W. Houston Health Care Grp., Inc.*, No. 01–94–01075–CV, 1995 WL 523615, at *6 (Tex.App.-Houston [1st Dist.] Sept. 7, 1995, no writ) (not designated for publication) in support of their construction of the contract. In that case, a corporation that was owned and operated by a physician, entered into an agreement with a hospital

under which the physician would provide cardiovascular services at the hospital. *Id.* at *1. The physician sued the hospital alleging that it violated the agreement by hiring another physician to perform the same services he contracted to perform. *Id.* at *1–2. The hospital filed a motion for summary judgment and argued that the contract was not exclusive. *Id.* at *1. The physician contended the contract was exclusive because it stated that he was to be available 24 hours a day, 7 days a week. *Id.* at *3. The trial court granted summary judgment in the hospital's favor and the physician appealed. *Id.* at *1.

The Houston Court of Appeals concluded that the contract was not ambiguous and was an "exclusive requirements contract." *Id.* at *6. The court noted that the contract stated that there was no minimum patient requirement and that the physician was only to perform his services when requested by the hospital's physicians. *Id.* However, the court reasoned that when reading the contract's language in context, it was clear that the parties intended for the hospital to request physician's services whenever a patient needed such services. *Id.* Additionally, the court noted that the contract expressly stated its purpose was to assure the availability of the physician's services for the hospital's "patients around the clock." *Id.* The court further concluded that finding the contract was non-exclusive would render it unenforceable for lack of mutuality. *Id.* The court explained that "[a]n agreement whereby a seller promises to provide goods or services at a stated price, without obligating the buyer to place any orders, is unenforceable for want of mutuality." *Id.* Simply put, a contract wherein one of the parties is not obligated to do anything is unenforceable. *Id.* We

---

**6.** This is undoubtedly because of the public policy that dictates physician referrals must remain motivated by the best interest of the patient and not by financial incentives.

find the court's opinion in *Cardiovascular* instructive.

 Texas courts generally construe contracts in favor of mutuality. *See, e.g., Tex. Gas Utils. Co. v. Barrett,* 460 S.W.2d 409, 412 (Tex.1970); *Young v. Neatherlin,* 102 S.W.3d 415, 420 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *Cardiovascular,* 1995 WL 523615, at \*6. The Texas Supreme Court has held that

> if one party makes an express promise that cannot reasonably be performed absent some type of performance by the other party, courts may imply a return promise so the dealings of the parties can be construed to mean something rather than nothing at all. *Portland Gasoline Co. v. Superior Mktg. Co.,* 150 Tex. 533, 243 S.W.2d 823, 824–25 (1951), *overruled on other grounds, N. Natural Gas Co. v. Conoco, Inc.,* 986 S.W.2d 603, 608 (Tex.1998). In *Portland,* we explained why mutual promises may be implied in this type of situation:

> > Mutuality may result from an implied obligation on the part of one of the parties. Though a contract on its face and by its express terms may appear to be obligatory on one party only, if it is manifest that it was the intention of the parties, and the consideration upon which one party assumed an express obligation, that there should be a corresponding and correlative obligation on the other party, such a corresponding and correlative obligation will be implied, and the contract held to be mutual,—as where the act to be done by the party expressly binding himself can only be done upon a corresponding act being done or allowed by the other party.

> *Id.* at 825. In other words, when it is clear that performance expressly promised by one party is such that it cannot be accomplished until a second party has

first performed, the law will deem the second party to have impliedly promised to perform the necessary action. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 850–51 (Tex.2009).

The construction of the contract Sadler advocates would render the contract unenforceable for lack of mutuality. If the PSA allowed Sadler to hire radiation oncologists outside of the contract and did not obligate Sadler to use GHRO's services, then Sadler's promise to perform was illusory. *See City of The Colony v. N. Tex. Mun. Water Dist.,* 272 S.W.3d 699, 725 (Tex.App.-Fort Worth 2008, pet. dism'd) (citing *Light v. Centel Cellular Co. of Tex.,* 883 S.W.2d 642, 645 (Tex.1994)); *see also Cardiovascular,* 1995 WL 523615, at \*6–7. The recitals on the first page of the PSA provide that the parties intend to make "mutual promises." Applying the relevant rules of contract construction and examining the language of the PSA in the context under which it was executed, the contract is not ambiguous. The only reasonable interpretation of the PSA is that it is an exclusive-provider agreement. Any other interpretation would negate the express language of the engagement paragraph and undercut Sadler's mutual obligation to perform. *See Cardiovascular,* 1995 WL 523615, at \*6–7. We hold the trial court erred in finding that the PSA was a nonexclusive agreement. We sustain issue one.

### B. Breach of the Agreement

In issue two, appellants assert that Sadler breached the PSA as a matter of law and ask us to render a judgment in their favor for damages. Likewise, in issue six, appellants argue the trial court erred in failing to award GHRO damages for Sadler's breach of the PSA.

 Whether a party breached an agreement is generally a question of law

for the court, not a question of fact for the jury. *Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex.App.-Houston [14th Dist.] 1996, writ denied); *Orix Capital Mkts., L.L.C. v. Washington Mut. Bank*, 260 S.W.3d 620, 623 (Tex.App.-Dallas 2008, no pet.). "Where the evidence is undisputed regarding a party's conduct under a contract, the judge alone must determine whether it shows performance or breach of its contract obligation." *Orix Capital Mkts.*, 260 S.W.3d at 623. Where there are disputed fact issues regarding a party's failure to perform under an agreement, those fact issues shall be submitted to the jury. *Id.*

The PSA states that the agreement "shall commence on July 15, 2008 unless the Center is not open for business on such date, in which case this Agreement shall commence on the date the Center is open for business (the "Effective Date") .... [and] shall expire ... one (1) year after the Effective Date, unless sooner terminated as provided in Section 12[.]" It is undisputed that the center was not open for business on July 14, 2008, when the PSA was signed. At trial, the parties disputed the effective date of the PSA. Appellants argued that the "center" opened for business on August 28, 2008, when the first patient was seen at Vision Park. Sadler argued that the "center" opened for business in February 2009 when GHRO began seeing patients at Pinecroft.[7]

■ It is undisputed that Sadler hired Berilgen in July 2009. Therefore, regardless of whether the PSA's initial one-year term began to run in August 2008 or February 2009, we conclude that Sadler breached the agreement as a matter of law. *See Orix Capital Mkts.*, 260 S.W.3d at 623. Fact issues exist though regarding whether GHRO first committed a material breach, excusing Sadler from performance and the appropriate amount of damages, if any, to be awarded for Sadler's breach. Therefore, we decline to render a judgment for damages in favor of GHRO for Sadler's breach, but we remand the disputed fact issues to the trial court for a new trial. *See id.* To the extent issue six requests a rendition of damages, issue six is overruled.

## III. THE MANAGEMENT AGREEMENT

In their second issue, appellants argue that the trial court erred in failing to declare that Sadler breached the Management Agreement.[8] Appellants argue that

---

7. GHRO's argument that the center opened for business in August 2008 is based on language set forth in the PSA. Specifically, a recital in the PSA states as follows:

> Practice Group leases and operates comprehensive cancer center located at 135 Vision Park Boulevard, The Woodlands, Texas 77384 and 9305 Pinecroft Drive, The Woodlands, Tx. 77380 (the "Center")[.]

A nearly identical recital is set forth in the Billing Agreement. At trial, Branstetter acknowledged that GHRO and ORS were operating within the parameters of their contracts when GHRO began seeing patients at Vision Park. However, Sadler argued that the definition of "Center" as set forth in the PSA, was controlled by a recital in the Management Agreement, which stated, "Clinic is construct-

ing a radiation therapy center (the "Center") in The Woodlands, Texas, to provide radiation treatment services[.]" There was significant testimony at trial regarding this issue. However, because the trial court found the PSA was non-exclusive, there was no need for a finding regarding the effective date of the PSA. We believe the issue regarding the effective date of the agreement could be resolved as a matter of law by applying the relevant principles of contract construction. Because it is not relevant to our disposition of this appeal, we find it inappropriate to address that issue here. Tex.R.App. P. 47.1.

8. In issue two, appellants also argue that the trial court erred in failing to declare that Sadler first breached the PSA and that such breach excused any subsequent breach by

Sadler breached the Management Agreement by terminating the agreement because the agreement was for a term of five years and could only be terminated early for cause. Sadler argues that appellants did not seek declaratory relief on this basis and pursuant to the plain language of the agreement, it could be terminated at any time, for any reason, upon payment of liquidated damages.

It is undisputed that Sadler terminated the Management Agreement without cause by sending OMS notice and a check for $200,000. At trial, the parties disputed the meaning of the contract's termination language. Branstetter testified that he understood the contract's language to mean that he could terminate the agreement "for any reason[,]" while Kanady testified that it could only be terminated "for cause." As we explained above, construction of an unambiguous contract is a question of law for the court. *MCI Telecomms. Corp.*, 995 S.W.2d at 650–51. Whether a contract is ambiguous is also a question of law.

■ In its first amended counterclaim, OMS sought a declaratory judgment from the court declaring that:

 a. Sadler's attempt to terminate the Management Agreement by letter dated August 13, 2009 was ineffectual because Sadler lacks cause, as detailed in Section 6.2(b) through (e) of the Management Agreement, to terminate the Agreement in the initial five year term; [and]

 b. The Management Agreement is still in full force and effect.

However, OMS failed to secure a ruling from the trial court regarding its request for declaratory relief, or otherwise regarding the construction of the Management Agreement. Sadler argues that the jury properly found that Sadler's early termination of the agreement without cause did not constitute a breach of the agreement. This misinterprets the jury's finding. The jury was not asked to interpret the contract or determine the intent of the parties. The only jury question regarding the Management Agreement asked the jury, "Did Sadler or OMS (Management) fail to comply with the OMS Agreement?" The jury answered "no" as to both parties. The jury was not instructed on the meaning of the contract's terms.

Appellants argue it is error for a trial court to submit an unambiguous contract to the jury, citing *GTE Mobilnet of S. Tex. Ltd. P'ship v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 290 (Tex.App.-Houston [1st Dist.] 1997, writ denied). *GTE* is inapplicable to the present case. In *GTE*, the trial court found the contract was ambiguous and submitted the fact issue of its interpretation to the jury. *Id.* at 289. The appellate court held the contract was not ambiguous and should have been construed as a matter of law. *Id.* at 290. In the present case, the trial court did not make a determination regarding the construction or ambiguity of the Management Agreement, nor was an issue regarding the contract's interpretation submitted to the jury.[9] Therefore, we decline to address the parties' arguments regarding the construction of the Management Agreement on appeal. *See* Tex.R.App. P. 33.1. We overrule issue two. In issue eight, appellants argue that the trial court erred in failing to award OMS damages for Sadler's breach of the Management Agree-

GHRO. Though we conclude in this opinion that Sadler breached the PSA by hiring Berilgen, the jury found that Sadler was not entitled to damages for GHRO's breach of the PSA. Therefore, we need not determine whether GHRO's breach of the PSA was ex-

cused by Sadler's breach. *See* Tex.R.App. P. 44.1(a).

9. Appellants did not submit any proposed jury questions or instructions regarding the construction of the Management Agreement.

ment. Because we overrule issue two, we need not address issue eight. Tex.R.App. P. 47.1.

## IV. JURY CHARGE ERROR

In issues three, four, five, and seven, appellants assert various facets of charge error. In these issues, appellants contend that the trial court erred in charging the jury by: (1) failing to submit the case "as a breach of contract/anticipatory breach case[,]" (2) "submitting this case as a conversion case[,]" (3) "introducing a breach of fiduciary duty theory into this case[,]" and (4) "combining entities in Question 1[.]"

### A. Breach of Contract or Excuse

In issue three, appellants argue that the jury should have been asked whether the plaintiff or defendant breached the respective agreements, followed by a question asking which party breached first. Appellants contend that Sadler's initial breach of the agreements, as a matter of law, excused any subsequent breach by appellants. Appellants cite *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200 (Tex.2004) for their contention that the issues regarding breach and excuse were improperly submitted to the jury.

The law is well settled that a material breach by one party excuses performance by the other party. *Id.* at 196; *Henry v. Masson*, 333 S.W.3d 825, 835 (Tex.App.-Houston [1st Dist.] 2010, no pet.). In *Mustang*, a pipeline owner filed suit for breach of a construction contract against the pipeline builder, and the builder counterclaimed for wrongful termination. *Mustang*, 134 S.W.3d at 196–197. The jury found that the builder failed to comply with the terms of the agreement but also found that the pipeline owner was not justified in terminating the contract. *Id.* at 197. The jury awarded both parties damages for the other's breach. *Id.* The Texas Supreme Court held that the build-

er's failure to complete construction of the pipeline in accordance with the contract deadline was a material breach of the contract, which discharged the pipeline owner from its duties under the agreement. *Id.* at 200. Therefore, the court held that the trial court "should have disregarded the jury's answer to the wrongful termination question and granted [the pipeline owner's] judgment notwithstanding the verdict." *Id.* The Court then stated:

> These problems could have been avoided had the trial court submitted the breach of contract question disjunctively ("Did Driver Pipeline Company or Mustang Pipeline Company fail to comply with the parties' contract?") accompanied by an appropriate instruction directing the jury to decide who committed the first material breach. In the standard contract dispute, one party cancels the contract or refuses to pay due to alleged breaches by the other; in such circumstances, jurors will often find *both* parties failed to comply with the contract (as the jury did here) unless instructed that they must decide who committed the first material breach.

*Id.* (citations omitted). We note that the language in *Mustang* regarding the preferred submission of contract disputes was dicta and not a specific directive to trial courts. *See id.*

██ Whether Sadler's breach of the PSA was excused is a fact issue that the fact-finder must determine on remand. Additionally, the jury found that neither party breached the Management Agreement. Therefore, regardless of whether the trial court's submission was proper, OMS was not harmed by the court's submission regarding breach of the Management Agreement. *See generally* Tex. R.App. P. 44.1(a)(1). With regard to the parties' breach of the Billing Agreement,

the following questions and instructions were submitted to the jury:

### QUESTION No. 3

Did Sadler or ORS (Billing and Collection) fail to comply with the ORS Agreement?

INSTRUCTIONS

You are instructed that a failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include the extent to which the injured party will be deprived of the benefit which he reasonably expected.

Answer "Yes" or "No."

Sadler: *yes*

ORS (Billing and Collection): *yes*

. . . .

### QUESTION No. 5

If your answer to Question No. 2, 3, or 4 was "Yes" as to Sadler then answer the following question. Otherwise, do not answer the following question.

Was such failure to comply excused?

You are hereby instructed that:

1. Failure to comply is excused by a previous failure to comply with a material obligation of the same agreement.

2. Failure to comply is excused by prior repudiation of the same agreement. A statement that one may abandon an agreement in the future is not a prior repudiation unless and until the intent to abandon is expressed in positive, unconditional and unequivocal words or actions so that the statement has the effect of repudiating the terms of the agreement and terminating the relations between the parties.

Answer "yes" or "no".

ANSWER: a. GHRO (Professional Services Agreement) _____

 b. ORS (Billing and Collection Agreement) *no*

 c. OMS (Management Agreement)_____

### QUESTION No. 7

If your answer to Question No. 2, 3, or 4 was "Yes" as to ORS (Billing and Collection) then answer the following question. Otherwise, do not answer the following question.

Was such failure to comply excused?

You are hereby instructed that:

1. Failure to comply is excused by a previous failure to comply with a material obligation of the same agreement.

2. Failure to comply is excused by prior repudiation of the same agreement. A statement that one may abandon an agreement in the future is not a prior repudiation unless and until the intent to abandon is expressed in positive, unconditional and unequivocal words or actions so that the statement has the effect of repudiating the terms of the agreement and terminating the relations between the parties.

Answer "yes" or "no"

Answer: *yes*

The jury found that both Sadler and ORS breached the Billing Agreement; however, the jury found that Sadler's breach was not excused while ORS's breach was excused. The jury awarded ORS $57,583 in damages for Sadler's breach.

▆▆▆ A trial court has broad discretion in submitting jury questions as long as the questions submitted were raised by the pleadings and evidence, control the disposition of the case, and properly present the disputed issues for the jury's determination. *Moore v. Kitsmiller*, 201 S.W.3d 147, 153 (Tex.App.-Tyler 2006, pet. denied). Additionally, charge error is not generally reversible error unless it caused the rendition of an improper verdict. *See* Tex.

R.App. P. 44.1(a)(1); *Transcon., Ins. Co. v. Crump*, 330 S.W.3d 211, 225 (Tex.2010). Here the jury determined whether Sadler and ORS breached the Billing Agreement and whether those breaches were excused by the other's "previous failure to comply with a material obligation[.]" We conclude this submission did not constitute an abuse of discretion. We overrule issue three.

### B. Breach of Fiduciary Duty and Conversion

In issues four, five and seven, appellants argue that the trial court erred in submitting Questions 1, 1(a), and 1(b) "because they improperly introduced fiduciary duty and/or conversion-type tort theories into this breach of contract case and failed to uphold the separate nature of the entities." Appellants' argument that the trial court introduced a breach of fiduciary duty theory into the case is based on a jury instruction that the trial court marked through. During the trial court's reading of the jury charge, the trial court noticed that a sentence in the general instructions, which appears to address whether GHRO and ORS had a burden to establish compliance with a fiduciary duty owed to Sadler, was inadvertently left in the charge. The trial court told the jury, "I'm going to strike that out. We struck that out and ... we didn't notice it. I'm going to strike [that] out[.]" The trial court marked through the instruction, but appellants argue that marking through the language was insufficient to remove the instruction and rendered the charge erroneous. Significantly, appellants did not object at trial to the trial court marking through the language in the charge. *See* Tex.R. Civ. P. 274; Tex.R.App. P. 33.1. Additionally, a plain reading of the jury charge indicates that there was no fiduciary duty theory submitted to the jury.

In issues four and seven, appellants challenge jury Question 1 on two bases: (1) the trial court improperly submitted a conversion theory of liability to the jury, and (2) the trial court improperly combined entities in a single question. The charge submitted the following in jury Question 1, 1(a), and 1(b):

**QUESTION No. *1***

Did GHRO or ORS (Billing and Collection) fail to turn over funds collected on Sadler's behalf?

Answer "Yes" or "No" as to each Defendant.

GHRO: *yes*

ORS (Billing and Collection) *no*

If you have answered "Yes" to GHRO in Question No. 1, then answer Question 1(a). Otherwise do not answer the following question

**QUESTION No. *1(a)***

What sum of money, if any, would fairly compensate Sadler for monies wrongfully withheld by GHRO?

Answer in Dollars and Cents. Do not add any amount for interest on damages, if any.

Answer: *$307,935*

If you have answered "Yes" to ORS (Billing and Collection) in Question No. 1, then answer Question 1(b). Otherwise do not answer the following question

**QUESTION No. *1(b)***

What sum of money, if any, would fairly compensate Sadler for monies that should have been collected but were not by ORS (Billing and Collection)?

Answer in Dollars and Cents. Do not add any amount for interest on damages, if any.

Answer: *$0*

With regard to Question 1, appellants' trial counsel stated in closing:

'What sum of money, if any, would fairly compensate Sadler with money wrongfully withheld from GHRO?' You could

write down the $304,000 figure in Mr. Branstetter's testimony. [Appellants' counsel] showed you. That's what they're claiming that's what we have, $304,000. We owe it to them. We'll pay it to them.... Does ORS have any of their money? No. That's a zero. ORS didn't receive the money, GHRO did.

In Question 1, the jury answered "yes" as to GHRO and "no" as to ORS and awarded Sadler $307,935 for monies wrongfully withheld by GHRO.

Appellants argue that the independent injury rule bars submission of Question 1. Appellants also argue that Questions 1 and 1(a) were improper because money cannot be converted.

▮ Under Texas Rule of Civil Procedure 274, "[a] party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." Tex.R. Civ. P. 274. A party is confined to the charge objections the party made at trial, and any new complaint on appeal is waived. *See Tex. Comm'n on Human Rights v. Morrison*, 346 S.W.3d 838, 848 (Tex.App.-Austin 2011, pet. filed); *see also Celanese Ltd. v. Chemical Waste Mgmt., Inc.*, 75 S.W.3d 593, 601 (Tex.App.-Texarkana 2002, pet. denied). Additionally, to preserve error for appellate review, a party must (1) make a timely objection to the trial court that "state[s] the grounds for the ruling that the complaining party [seeks] from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context[,]" and (2) obtain a ruling. Tex.R.App. P. 33.1(a); *see State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex.1992) (In order to preserve a charge complaint for review, the trial court must be made aware of the complaint timely and plainly.)

▮ At the charge conference, the trial court stated as to jury Question 1, "I have not given a fiduciary relationship question. [Question 1] is simply used as a conversion question instead." Appellants objected to Question 1 as follows:

We do have objections. The submitting of this question using GHRO or GHRO and/or ORS submits two different legally recognized entities-separate entities, one of which was not a party to the billing and collection contract. It's improperly combined in all the parts and subparts of 1, 1A, and 1B—those entities and disregards to their legal—legally separate entities. 1A appears to—and I've scanned through this—it appears to be a duplicate of Question 2 because it doesn't identify the agreement. It is conditioned on the billing and collection agreement, I guess. But since GHRO is not a party to that agreement, it's improper to submit that damages question in 1A. So we would object to the submission of 1A, as well as the mention of GHRO in relationship to the billing agreement.

Appellants did not make any objection to Questions 1, 1(a) or 1(b) indicating that the trial court was submitting the case on an improper theory of liability or seeking damages barred by Texas law. Because the objection did not bring these specific complaints to the attention of the trial court, we conclude they are not preserved for review. *Morrison*, 346 S.W.3d at 848; *see also* Tex.R. Civ. P. 274; Tex.R.App. P. 33.1; *Payne*, 838 S.W.2d at 240-41. We overrule issues four and five.

▮ In accordance with their objection at trial, appellants argue in issue seven that Question 1 was improper because it combined distinct entities that had separate contracts with Sadler, thereby confus-

ing the jury. We are unpersuaded that this submission confused the jury or constituted reversible error. *See generally* Tex.R.App. P. 44.1. Both GHRO and ORS were separately defined in the jury charge instructions. Moreover, there were separate blanks for the jury to determine the liability, if any, of each entity. Though each entity had separate contracts with Sadler, the issue of whether those contracts were breached was dealt with elsewhere in separate jury questions. Additionally, we note the court's disjunctive submission comports with the form suggested by the court in *Mustang. See Mustang,* 134 S.W.3d at 200; *see also Thota v. Young,* 366 S.W.3d 678, 692 (Tex. 2012) (citing Comm. On Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 4.1 (2010)) (noting the Texas Pattern Jury Charge's longstanding use of separate blanks when multiple parties' negligence is in issue). We overrule issue seven.

## V. ATTORNEYS' FEES

The trial court's judgment ordered that Sadler recover attorneys' fees from GHRO, ORS, and OMS in the amount of $500,000.[10] In issues nine, ten, and eleven appellants challenge the trial court's award of attorneys' fees. Specifically, appellants argue the trial court erred (1) in awarding attorneys' fees to Sadler, (2) in awarding twice the amount of attorneys' fees than Sadler incurred, and (3) by failing to award attorneys' fees to ORS.

### A. Award of Attorneys' Fees to Sadler

■■■ Attorneys' fees may only be awarded if authorized by statute or by a

contract between the parties. *Intercontinental Group P'ship v. KB Home Lone Star, L.P.,* 295 S.W.3d 650, 653 (Tex.2009). Sadler asserts that it is entitled to attorneys' fees pursuant to the PSA and the Management Agreement. Sadler further contends that the court's award of attorneys' fees is authorized by statute, both under the Declaratory Judgment Act and for its breach of contract claim. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 37.009, 38.001(8) (West 2008). Finally, Sadler argues that the damages it received for GHRO's conversion of funds supports its award of attorneys' fees.

■■■ The PSA states, "[i]f either party engages an attorney to enforce its right hereunder in a court proceeding, the prevailing party shall be entitled to its costs, expenses, and reasonable attorneys['] fees." The PSA does not define the term "prevailing party." Therefore, we presume the parties intended the term to have its ordinary meaning. *See KB Home,* 295 S.W.3d at 653. To be a prevailing party, a plaintiff must receive some relief on the merits of his claim. *Id.* at 654. We recognize that relief other than an award of damages may be sufficient to support an award of attorneys' fees. *See id.* at 654–55; *see also City of Amarillo v. Glick,* 991 S.W.2d 14, 17 (Tex.App.-Amarillo 1997, pet. denied) ("Determination of whether a party is the prevailing party or successful party must be based upon success on the merits, and not whether or not damages were awarded."). In *KB Home* the Court explained:

> Whether a party prevails turns on whether the party prevails upon the

**10.** Additionally, the jury awarded Sadler $75,000 for representation through appeal to the court of appeals, $50,000 at the petition for review stage in the Supreme Court of Texas, and an additional $30,000 and $20,000 in the event the case was briefed and argued

to the Texas Supreme Court. The trial court's judgment awarded Sadler the attorneys' fees awarded by the jury for the appeals processes in the event any defendant unsuccessfully appealed.

court to award it something, either monetary or equitable. KB Home got nothing except a jury finding that Intercontinental violated the contract. It recovered no damages; it secured no declaratory or injunctive relief; it obtained no consent decree or settlement in its favor; it received nothing of value of any kind, certainly none of the relief sought in its petition. No misconduct was punished or deterred, no lessons taught. KB Home sought over $1 million in damages, but instead left the courthouse empty-handed: 'That is not the stuff of which legal victories are made.' Nor do we perceive any manner in which the outcome materially altered the legal relationship between KB Home and Intercontinental.

*KB Home,* 295 S.W.3d at 655 (footnotes omitted). The Court in *KB Home* concluded, "[a] stand-alone finding on breach confers no benefit whatsoever. A zero on damages necessarily zeroes out 'prevailing party' status for KB Home." *Id.* at 655–56.

Like the jury in *KB Home,* the jury in the present case found that GHRO breached the PSA but awarded Sadler no damages for the breach. However, Sadler argues that it is a prevailing party under the terms of the PSA because it sought a declaratory judgment from the trial court that the PSA was a non-exclusive agreement and obtained a finding in its favor regarding the same. Assuming but without deciding that the trial court's finding regarding the nature of the PSA is sufficient to impart prevailing party status on Sadler, we have reversed that finding. Therefore, the trial court's finding and instruction regarding the nature of the PSA cannot support the jury's award of attorneys' fees under that agreement. *See La-Freniere v. Fitzgerald,* 669 S.W.2d 117, 119 (Tex.1984) (If a judgment is reversed on appeal, the party that obtained the favorable relief loses the right to recover attorneys' fees awarded in the judgment.).

We next determine whether the Management Agreement supports the award of attorneys' fees. The Management Agreement provides as follows:

7.11 *Legal Expenses.* In the event that either party incurs legal or court costs associated with enforcing the obligations of the other party to this Agreement or in connection with or as a result of the breach of a representation, warranty or obligation by the other party under this Agreement, then such party that has incurred such costs shall be entitled to recover such costs from the party who has failed to honor its obligations under this Agreement or has breached its representations, warranties or obligations hereunder.

■ As we explained above, OMS filed a declaratory judgment action seeking a declaration that the Management Agreement could only be terminated for cause. However, OMS failed to obtain a finding regarding the nature of the Management Agreement from the trial court or the jury. The jury found that neither party breached the Management Agreement. Therefore, the trial court's award of attorneys' fees is not authorized under the Management Agreement.

■ The Texas Civil Practice and Remedies Code authorizes an award of attorneys' fees if a party prevails under a breach of contract claim. Tex. Civ. Prac. & Rem.Code § 38.001(8). The Texas Supreme Court has held attorneys' fees may only be awarded under section 38.001 if the party " '(1) prevail[s] on a cause of action for which attorney's fees are recoverable, and (2) recovers damages.' " *KB Home,* 295 S.W.3d at 653 (quoting *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 390 (Tex.1997)). Thus, a party who prevails on a breach of contract claim but is awarded zero damages is not entitled to attorneys' fees pursuant to section 38.001. *Solis,* 951

S.W.2d at 390. Therefore, Sadler is not entitled to attorneys' fees for its breach of contract claim. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8).

 Likewise, we are not persuaded by Sadler's argument that the trial court's award of attorneys' fees is supported by the jury's award of damages to Sadler for GHRO's failure to turn over funds collected on Sadler's behalf. Sadler argues that while attorneys' fees are not generally recoverable for conversion, attorneys' fees may be recovered "where the circumstances of the case reveal that the action is founded upon a contract[.]" Sadler cites *Exxon Corp. v. Bell,* 695 S.W.2d 788, 791 (Tex.App.-Texarkana 1985, no writ) in support of this contention. However, *Bell* is inapplicable here. In *Bell,* the court concluded that the resolution of plaintiff's conversion claim "depended entirely on the contractual interpretation" issue before the court, therefore, plaintiff's "cause of action was sufficiently grounded on [the] contract to support the trial court's award of attorney's fees[.]" *Id.* at 791. It is undisputed that GHRO was not a party to the Billing Agreement. Additionally, the resolution of the conversion claim did not depend on an interpretation of the Billing Agreement, or any other written agreement. GHRO admitted at trial that it was holding roughly $309,000 that it owed Sadler. We conclude the jury's award of damages to Sadler for GHRO's failure to turn over funds it collected on Sadler's behalf and admittedly owed to Sadler does not support the trial court's award of $500,000 in attorneys' fees.

Sadler also argues the trial court's award of attorneys' fees is authorized under the Declaratory Judgments Act because Sadler sought and obtained a favorable finding regarding the exclusive nature of the PSA. The Declaratory Judgment Act permits the trial court to award reasonable and necessary attorneys' fees as

are equitable and just. Tex. Civ. Prac. & Rem.Code Ann. § 37.009. Appellants argue that the Declaratory Judgments Act cannot support the trial court's award of attorneys' fees because the judgment does not award Sadler any declaratory relief and any such relief was merely incidental to its other claims. This suit began with Sadler's request that the trial court declare the PSA to be a non-exclusive agreement. Sadler's claim that the PSA is not exclusive goes to the heart of both sides of this dispute.

 An appellate court's reversal of the trial court's decision on a declaratory judgment action does not necessarily mean the award of attorneys' fees to the prevailing party constitutes an abuse of discretion. *SAVA Gumarska in Kemijska Industria D.D. v. Advanced Polymer Scis., Inc.,* 128 S.W.3d 304, 324 (Tex.App.-Dallas 2004, no pet.). This is because the statute does not require that a party prevail on a claim to be entitled to fees. *See id.; see also* Tex. Civ. Prac. & Rem.Code Ann. § 37.009. However, reversal of a declaratory judgment on appeal may render the trial court's award of attorneys' fees inequitable or unjust. *SAVA Gumarska,* 128 S.W.3d at 324; *see also Barshop v. Medina Cnty. Underground Water Conservation Dist.,* 925 S.W.2d 618, 637–38 (Tex. 1996). Under such circumstances, an appellate court may reverse a trial court's award of attorneys' fees and remand the issue for reconsideration. *Id.; see also Ferguson v. Ferguson,* 111 S.W.3d 589, 600 (Tex.App.-Fort Worth 2003, pet. denied).

 Here, the trial court did not state the basis of its award of attorneys' fees. We note that fees were awarded against both GHRO and OMS. The Declaratory Judgment Act cannot serve as an appropriate basis for the award of fees against OMS. We find the award of attorneys' fees against OMS improper. Additionally, Sad-

ler made no attempt to segregate its attorneys' fees. *See Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 312–14 (Tex. 2006). In light of the foregoing, coupled with our disposition on appeal, we reverse the trial court's award of attorneys' fees and remand the issue for the trial court's reconsideration upon final disposition of this case. We sustain issue nine. Therefore, we need not address issue ten. Tex. R.App. P. 47.1.

### B. Failure to Award Attorneys' Fees to ORS

In issue eleven, appellants argue that the trial court erred in failing to award attorneys' fees to ORS. The Billing Agreement's provision regarding fees is nearly identical to that set forth in the Management Agreement. Appellants argue that under the terms of the Billing Agreement, ORS was entitled to recover the legal fees and court costs it incurred as a result of Sadler's breach of the Billing Agreement. Sadler argues that because the jury found both parties breached the agreement, under the terms of the Billing Agreement each was entitled to fees for the other's breach; therefore "the awards offset each other[.]" Sadler cites no authority to support this position. ORS's breach of the Billing Agreement was excused by Sadler's prior breach. Therefore, under both Texas law and the terms of the Billing Agreement, ORS was entitled to attorneys' fees. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001. We sustain issue eleven. Significantly, however, appellants made no attempt to segregate their attorneys' fees. *See Chapa,* 212 S.W.3d at 312–14. Therefore, we remand this issue to the trial court for a determination of the appropriate amount of attorneys' fees to which ORS is entitled. *See id.* at 314.

## VI. CROSS–APPEAL

Sadler asserts two points in a cross-appeal. In its cross-points, Sadler argues that the trial court erred in refusing to submit to the jury the breach of fiduciary duty and civil conspiracy questions proffered by Sadler. We overrule both cross-points.

The trial court must submit a requested question to the jury if the pleadings and any evidence support it. Tex.R. Civ. P. 278; *Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex.1992). As we explained earlier in this opinion, the trial court has broad discretion in submitting questions to the jury subject to the requirement that the questions submitted properly present the disputed issues to the jury. *Moore,* 201 S.W.3d at 153. The trial court acts within its discretion in refusing to submit a proposed jury question if there is no evidence to support its submission and the issue was not pleaded or tried by consent. *See Alaniz v. Jones & Neuse, Inc.,* 907 S.W.2d 450, 452 (Tex.1995); *see also Gibbins v. Berlin,* 162 S.W.3d 335, 341 (Tex. App.-Fort Worth 2005, no pet.).

### A. Breach of Fiduciary Duty

"There are two types of fiduciary relationships: formal fiduciary relationships that arise as a matter of law, such as partnerships and principal-agent relationships, and informal fiduciary relationships or 'confidential relationships' that may arise from moral, social, domestic, or personal relationships." *McAfee, Inc. v. Agilysys, Inc.,* 316 S.W.3d 820, 829 (Tex.App.-Dallas 2010, no pet.). Sadler argues that GHRO and ORS were agents of Sadler giving rise to fiduciary duties, which Sadler contends GHRO and ORS breached.

Generally, an agent is one who consents to the control of a principal, and the principal manifests consent for the

agent to act on behalf of the principal. *Hanna v. Vastar Res., Inc.,* 84 S.W.3d 372, 376 (Tex.App.-Beaumont 2002, no pet.). Courts will not presume a principal and agent relationship; the party asserting the agency has the burden of proof. *Id.* To prove an agency relationship between parties, the party asserting the agency must prove the principal has the right to assign the agent's task and the right to control the means and details by which the agent will accomplish its assigned task. *Id.; O'Bryant v. Century 21 S. Cent. States, Inc.,* 899 S.W.2d 270, 271 (Tex.App.-Houston [14th Dist.] 1995, no writ). "[T]he right of control must pertain to a task or matter [that is] material to the lawsuit." *O'Bryant,* 899 S.W.2d at 271. The extent of the principal's control over the details of the assigned task is primarily what differentiates an agent from an independent contractor. *Hanna,* 84 S.W.3d at 376.

Sadler contends that "ORS and GHRO were each Sadler's agents pursuant to their respective agreements to act on Sadler's behalf regarding payments belonging to Sadler." Sadler contends that the PSA and the Billing Agreement reflect promises by GHRO and ORS "to act in the best interests of Sadler and to act on Sadler's behalf in certain instances, subject to Sadler's control." Sadler points specifically to ORS's obligation, pursuant to the Billing Agreement, to "collect monies owed to Sadler" and to GHRO's oral agreement to bill under GHRO's tax identification number, and collect and remit monies owed to Sadler. Appellants argue that the relationship of the parties as defined by the agreements establishes that GHRO and ORS were not fiduciaries.

Both the PSA and the Billing Agreement contain provisions that expressly state that GHRO and ORS are independent contractors. The PSA states as follows:

2. *Independent Contractors.* It is expressly acknowledged by the parties hereto that Practice Group and Provider are "independent contractors," and that nothing in this Agreement is intended nor shall be construed to create an employer/employee relationship, a joint venture relationship, or to allow Practice Group to exercise control or direction over the manner or method by which Provider performs the services called for hereunder; provided, always, that the services to be furnished by Provider hereunder shall be provided in a manner consistent with Practice Group's policies and procedures for radiation oncology services provided at the Center, the applicable billing standards governing such services, including, but not limited to, Medicare and Medicaid billing rules and guidelines, and the provisions of this Agreement.

The Billing Agreement has a virtually identical provision except that it refers to ORS[11] and specifically references the performance of billing and collection services.

Sadler argues that the independent contractor clauses in the agreements are not dispositive of the relationship between the parties. Here, the independent contractor provisions set out a clear intent between the parties not to give Sadler "control or direction over the manner or method by which [appellants] perform[ed] the services" called for in their respective agreements. Moreover, the evidence in the record supports that Sadler did not control the means or details by which the agreements were performed. For example, ORS used its own database, Centricity, in billing and collecting for Sadler. Additionally, ORS planned to, and ultimately did, create a separate database so that Sadler could directly access Centricity and generate its own reports with the information it

11. ORS is specifically defined and referred to in the Billing Agreement as "Contractor."

wanted. After Sadler went to the Next-Gen billing system, ORS continued using Centricity. We further note that it was ORS that suggested Sadler bill under GHRO's tax identification number while GHRO physicians were not credentialed.

Sadler points to subsequent language in the independent contractor provisions, which provides generally that the respective services must be performed in a manner "consistent with Sadler's policies and procedures." Additionally, Sadler points to ORS's obligation under the Billing Agreement to collect money on behalf of Sadler, ORS's efforts to create the bi-directional database even though this was not required under the terms of the Billing Agreement, and that both GHRO and ORS provided collection reports to Sadler early in the month as directed by Sadler, even though "this earlier [due] date was not spelled out" in the agreements. However, Sadler has failed to point to evidence sufficient to raise a fact issue regarding whether ORS and GHRO were agents of Sadler, giving rise to a fiduciary relationship. Rather, Sadler points to evidence that GHRO and ORS were willing to work with Sadler to meet Sadler's needs and achieve the goals of the PSA and Billing Agreement. On the record before us, we find that the submission of jury Question 1 in lieu of Sadler's proposed breach of fiduciary duty question did not constitute an abuse of discretion or lead to the rendition of an improper verdict. *See Moore*, 201 S.W.3d at 153; *see* Tex.R. Civ. P. 277, 278; Tex.R.App. P. 44.1. We overrule Sadler's first cross-point.

### B. Civil Conspiracy

To establish a civil conspiracy, one must establish (1) a combination of two or more persons, (2) an unlawful purpose to be accomplished (or a lawful purpose by unlawful means), (3) a meeting of the minds on the course of action, (4) one or more unlawful overt acts in furtherance of the conspiracy, and (5) damages. *Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 381 (Tex.App.-Houston [1st Dist.] 2007, no pet.); *see Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex.1996). Sadler argues that the evidence is undisputed that "GHRO intended to and did withhold money that it knew belonged to Sadler." Sadler further contends that "ORS had knowledge of GHRO's actions and . . . did nothing to try to collect such wrongfully withheld monies." This evidence is insufficient to support a jury question regarding civil conspiracy. *See Tilton*, 925 S.W.2d at 681 (holding that a defendant's liability for civil conspiracy depends on its participation in some underlying tort). The jury found that ORS did not wrongfully withhold money from Sadler. There is no evidence of a meeting of the minds between GHRO and ORS to wrongfully withhold funds collected on Sadler's behalf. Nor is there any evidence of an unlawful overt act by ORS in furtherance of the alleged conspiracy. Based on our review of the record, we conclude that jury Question 1 properly placed the disputed issue before the jury. *See Moore*, 201 S.W.3d at 153; *see* Tex.R. Civ. P. 277; *see also* Tex.R.App. P. 44.1. The trial court did not abuse its discretion by refusing to submit Sadler's proposed civil conspiracy question. We overrule Sadler's second cross-point.

### VII. CONCLUSION

We hold as a matter of law that the PSA is an exclusive contract. We further hold that by hiring Berilgen, Sadler breached the PSA. Having sustained issue one, we remand this case to the trial court for a determination of whether Sadler's breach was excused by any prior material breach of GHRO and what damages, if any, are appropriate. In light of our disposition on appeal, we likewise reverse the trial court's award of attorneys' fees to Sadler

and, as it relates to the breach of contract in issue one, remand the issue of reasonable attorneys' fees to the trial court. Having concluded that ORS is entitled to reasonable attorneys' fees, we remand this issue to the trial court as well. We affirm the judgment in all other respects.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

DAVID GAULTNEY, Justice, dissenting.

"[W]here an unambiguous writing has been entered into between the parties, the Courts will give effect to the intention of the parties as expressed or as is apparent in the writing." *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968); *see also Lenape Res. v. Tenn. Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996) ("as expressed in the written instrument"). The PSA states that Sadler is not required to refer *any* patients to, or order *any* goods or services from, GHRO:

> 26. *No Referral Obligation.* Provider and Practice Group expressly acknowledge and agree that nothing contained in this Agreement shall require either party hereto to refer (or influence the referral of) any patients to, or order any goods or services from, the other party or any affiliated entity. Notwithstanding any unanticipated effect of any provision of this Agreement, neither party shall knowingly or intentionally conduct itself in such a manner as to violate the provisions against fraud and abuse in connection with the Medicare and Medicaid programs (42 U.S.C. § 1320a–7b).

Nothing in the PSA characterizes GHRO as the exclusive provider of services at the Center. To the contrary, the writing unambiguously provides the one-year contract is non-exclusive. And this contract may have been negotiated in an environment impacted by "complex rules, regula-

tions and exceptions[.]" *See* Patrick A. Sutton, *The Stark Law in Retrospect,* 20 Ann. Health L. 15, 15 (Winter 2011). This Court should not write an exclusivity provision into the parties' agreement, and then hold as a matter of law the provision was breached. I respectfully dissent.