

# NUMBER 13-22-00599-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**DAMIEN GABRIEL GARZA,**                            **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                 **Appellee.**

## ON APPEAL FROM THE 24TH DISTRICT COURT OF JACKSON COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Tijerina and Peña**
**Memorandum Opinion by Justice Peña**

Appellant Damien Gabriel Garza appeals his conviction for the capital murder of N.F., an individual under ten years of age. *See* TEX. PENAL CODE ANN. § 19.03(a)(8). After a jury returned a guilty verdict, the trial court imposed a term of life imprisonment without the possibility of parole. *See id*. § 12.31(a)(2). In six issues, which we re-organize as five,

Garza argues that: (1) there was insufficient evidence to support his conviction; (2) the trial court erred in permitting a jailhouse informant to testify who was not disclosed prior to trial; (3) the trial court erred in permitting the grand jury foreman to testify; (4) the trial court erred in failing to grant Garza's motion for severance; and (5) the trial court erred in denying Garza's motion to suppress the underlying arrest affidavit and in not allowing an expert "to testify in his defense as to whether there was probable cause to arrest [Garza] in the first instance." We affirm.

## I.     BACKGROUND

Garza and co-defendant Karina Flores were indicted on multiple counts related to the death of Flores's four-year-old son, N.F., including one count of capital murder. *See id.* § 19.03(a)(8). Count one alleged that on or about February 25, 2021, Garza and Flores, "acting either as a principal or a party," "intentionally and/or knowingly . . . cause[d] the death of an individual, [N.F.]," who "was a child younger than [ten] years of age" by: (1) "[c]ausing [N.F.] to strike a firm surface"; (2) "[s]triking [N.F.] with the defendant's hand"; (3) "[s]triking [N.F.] with the defendant's foot"; (4) "[s]triking [N.F.] with a hard object"; (4) "[s]triking [N.F.] with an object unknown to the Grand Jury"; and/or (5) "[a]sphyxiating [N.F.] by a means unknown to the Grand Jury."

The State did not seek the death penalty and abandoned all counts except for count one prior to trial. A joint jury trial commenced on October 31, 2022, at which the following evidence was adduced. At around 12:46 a.m. on February 25, 2021, Flores arrived at the emergency room of the Jackson County Hospital in Edna, Texas, holding her son N.F., with Flores appearing "distraught with a child in her hands that looked like [he] was unresponsive." N.F. was not breathing and had no pulse. Emergency room

2

technician Thomas Roznovsky testified that, when N.F. arrived at the hospital, he looked "unkept" and "dirty." After removing N.F.'s clothing, Roznovsky discovered that what he thought was dirt was "actually . . . bruising in different stages, yellows, greens, blacks, brown, purple." Roznovsky also noticed several burn marks on N.F.'s body in different stages of healing and "discolorations around the neck, . . . ligature marks." After removing N.F.'s diaper, Roznovsky identified further bruising and burn marks on the child's buttocks. He said "[t]here were several scars, also, on the abdomen." There were also "cuts and marks on the child. A lot." Roznovsky noted that Flores seemed "distracted" during this time. "She was on the phone the whole time," which Roznovsky found "kind of bizarre."

Dr. Cindy Cedillo-Ruiz (Cedillo) treated N.F. in the emergency room. Dr. Cedillo opined that N.F.'s injuries appeared to be "intentional," and affirmed that they would have been "apparent" to a person of "average observation and intellect, or even someone with diminished abilities." Dr. Cedillo authored a "Physician Clinical Report," which was admitted into evidence. As the report details, when Flores first came into the hospital, she reported that N.F. had thrown a "tantrum." According to Dr. Cedillo, she

> spoke to [Flores] outside trauma room in the presence of [D]eputy [Christopher] Marlow with Jackson County Sheriff['s Office]. [Flores] [r]eports patient had been asleep and she went to check on patient because he had upper respiratory symptoms for past few days, noticed patient had a bladder accident in sleep. [Flores] [r]eports [she] woke up patient, took to restroom, placed in shower and that patient then had tantrum including breath holding and fell in bathtub. [Flores] [t]hen reports [she] initiated CPR at home bathroom. When asked why did she not call 911, mother stated she "didn't know what to do." Reports [she] was driven to [hospital] by a friend.

Marlow was dispatched to the Jackson County Hospital at 1:45 a.m. on the date in

3

question to investigate potential child abuse. Marlow walked over to Flores and found that "she was just completely indifferent to the situation by her appearance." Flores was involved in a conversation on her cellphone and initially ignored Marlow, which "shocked" and "angered" him. When Flores responded to Marlow, she did so while still on her phone. Because Marlow could hear the other voice on the phone, he noticed that Flores was repeating the information given to her by the other person on the phone.

| [Marlow]: | Yes, sir. It was, again, extremely frustrating. I kept asking her, "How did you get here? How did you get here?" |
|---|---|
| [Prosecutor]: | And what did she say to that? |
| [Marlow]: | She would just look at me with her cold, lifeless eyes and talk into the phone and say, "They want to know how I got here." And then I heard a male voice on the other end say, "A friend." And then she would answer me. |
| [Prosecutor]: | And what would she say? |
| [Marlow]: | "A friend." |

Two hours after arriving, N.F. was transported to Texas Children's Hospital in Houston. Flores was interviewed there by Chief David Merritt of the Granado Police Department and Texas Ranger John Lingle. This interview was recorded and entered into evidence. When asked what happened with N.F., Flores stated that she has been struggling with potty training N.F., and that he has "tantrums" where he will "fall to the floor, and he will pretend like he's unconscious." On the night in question, N.F. peed himself, had a tantrum requiring Flores to "drag him" into the bathroom to clean up, and while she was getting his clothes from another room, "that's when he just, he fell."

Although she refused to say at first, Flores eventually stated that Garza is the one

4

who had dropped her off at the hospital. Flores described Garza as a "family friend" and denied being in a relationship with him. Flores would not provide the name of the person she said watched N.F. while she worked. Asked about N.F.'s other injuries, Flores stated that "he's been doing these tantrums where, um, he'll like fall to the floor, and he'll act like, you know he's not responsive and you know like stuff like that." Flores stated that N.F. had been having these tantrums for the past two weeks, and that "[m]ost of these injuries [are] from that. It's from him just, just not wanting to use the restroom." Flores denied knowing anything about burn marks on N.F. and explained that N.F. appeared to have choke marks because he would "act like he's unconscious and he'll like have his head hanging out of the bathtub."

Flores stated that she believed N.F.'s "mental issues" were causing his behavior. She also described him as "spoiled" and "lazy" for his resistance to her attempts to potty train him. At first, Flores admitted only to spanking N.F. with her hand. Later, she admitted that she also used a wooden shower brush, and "just kept hitting him, until [she] realized" what she had done. She admitted to using the wooden brush multiple times, knowing "not to hit him in the same spots." Flores admitted to using the wooden brush as recently as the week before the incident to strike N.F.'s back because he would sink into the toilet during potty training. She then explained that on the night in question, N.F. had peed in the bed and she told him to go the restroom. She said: "As soon as I told him to get up, . . . he starts making a whiny face. I have to drag him to the restroom, force him to go to the restroom. . . . I went and grabbed his clothes," and when she came back, N.F. was lying on his side in the bathtub, non-responsive. After trying to do CPR, she stated "we just drove straight to the hospital."

5

In a pre-arrest interview on March 3, 2021, which was entered into evidence, Garza admitted to sharing a residence with Flores and N.F. for the past two years. Garza detailed how N.F. had spent most of his life with his maternal grandparents, and that N.F. had only been staying with them for a few months, having moved in around August of 2020. Garza mentioned that the grandparents might have not wanted to care for N.F. any longer because of his "attitude problem," and he opined that N.F. was autistic. Garza stated that he was unemployed and would watch N.F. when Flores would work. Like Flores, when asked to explain N.F.'s injuries, Garza stated that N.F. would have episodes and "hit himself," including sometimes while bathing. Garza stated that for the past three weeks N.F. would have episodes and would "fall to the ground and hit his head," "and that's how he was you know getting all that stuff on the side of his face and stuff."[1] Garza opined that N.F. behaved this way "to get a reaction out of us"; he said "that's the way he wanted attention." Garza denied ever disciplining N.F. or hitting him. Garza stated that "he didn't need to" because Flores would discipline N.F. Asked whether he was there on the "night of this last incident," Garza responded "yes." As to why he did not enter the hospital with Flores and N.F., Garza stated that he thought he would not have been allowed inside because of COVID restrictions, and he believed the hospital was closed because of the recent winter freeze.

After several days at Texas Children's Hospital, N.F. died on March 1, 2021. N.F.'s autopsy report listed the manner of death as "homicide." The report notes that "[t]here is evidence of multiple recent blunt force injuries involving the head, neck, torso, and the

---

[1] Garza's cellphone search history was admitted into evidence. On February 28, 2021, prior to his interview, Garza made a search using the following queries: "knocked into a comah [sic]," and "people falling and knocking self out."

extremities." These injuries were "consistent with traumatic brain injury with resultant cerebral hypoxic/ischemic neuronal damage." There was also evidence of "remote" blunt force injuries, including "[m]ultiple healed scars involving the head, neck, torso, and the extremities," and "[r]emote fractures . . . on the ribs, second lumbar vertebra, hands, and possibly the sternum." Dr. Rafael Garcia, who performed the autopsy, testified that N.F.'s injuries were "indicative of non[-]accidental injury," and affirmed that the injuries were "intentional." He further narrowed the cause of death to a single instance of blunt force trauma to the head, which caused N.F.'s traumatic brain injury. A report from the State's forensic pathologist notes that N.F.'s injures were consistent with "compression of the chest" and "compression of the spinal column," and that "the hand injuries are consistent with one or more direct impacts to the knuckles." The forensic pathologist testified that some of N.F.'s injuries were weeks or months old.

Dr. Marcella Donaruma, who treated N.F. at Texas Children's Hospital, testified on behalf of the State as to the "kind of forces" that could have caused N.F.'s injuries, and "what manner and means [were] used to inflict injury." Dr. Donaruma testified that N.F.'s injuries were not consistent with self-inflicted injuries, explaining that children "don't bang their heads until they break bones or blood vessels." She also explained that autism or other psychological issues did not help explain his injuries.

Dr. Donaruma testified that, in her opinion, N.F.'s injuries were consistent with "child torture."

> Child torture is child abuse. Child torture is defined by a constellation of circumstances where a child experiences two or more physical assaults or an extended—a single extended physical assault. It is coupled with psychological maltreatment which could take the form of depredation, rejection, isolation, depravation, terrorizing.

7

And then in the context of those findings, there's also neglect of medical care needs, basic needs, human needs like clothing and shelter, and the consequences of this constellation of circumstances leads to prolonged suffering, disfigurement or disability, or death.

Dr. Donaruma noted that she had reviewed certain exhibits provided by the State, which had been discovered in a search of digital devices belonging to Flores and Garza, including photographs which show Garza standing over N.F. with a bowl of food in his hand, with a belt draped around his neck.[2] Dr. Donaruma also viewed a video admitted into evidence, in which Garza and Flores can be heard disciplining N.F. In the video, created in September of 2020, N.F. can be seen holding a blue bucket, with his arms shaking.[3] A large dark purple bruise can be seen between his eyes. Garza and Flores can be heard telling N.F. the following:

| [Flores]: | I'm recording him. |
|---|---|
| [Garza]: | That wasn't no spirit[4] that came out of him, that was him throwing up, and he looked at all of us to see if we were going to spank him or do something, and since we didn't, this is what it feels like. You need to cut it out man. |
| [Flores]: | He's making himself do it. |

---

[2] This photograph was also referenced by Lingle in his arrest affidavit. Lingle further noted that a search of the house uncovered the belt in question and black marks along the interior walls of the house. According to Lingle, based on the condition of the belt, the marks on the wall were consistent with the use of the belt on the wall.

[3] A similar-looking blue bucket was found during a search of the home. Photographs of the bucket and its contents, which were entered into evidence, show that the bucket contained ramen noodles which appear to have been thrown up.

[4] The State introduced into evidence a printed document discovered during the search of Garza and Flores's residence. As Lingle explained, this document describes "like an exorcism or something of that nature, like a religious ceremony." This document includes paragraphs like the following: "I exercise this authority on [my child's] behalf to break all curses, spells, evil wishes, evil distress, darkness, magic, hereditary seals, satanic pronouncements, bonds, covenants, dedications, initiations, both known and unknown on her mother's and father's sides all the way back to Adam."

| | |
|---|---|
| [Garza]: | Now you're starting to make yourself throw up. Now you are going to stand there and hold that bucket. Congratulations son. |
| [Flores]: | If you're going to throw up, throw up. Unless you're making yourself do it. Hurry up. |
| [Garza]: | You're just playing sick bro. |
| [Flores]: | You like the camera? |
| [Garza]: | See look at him. He knows he is being recorded, so . . . . |
| [Flores]: | I just showed him and he was all like, is that me? |
| [Garza]: | Is that you? Yeah that is you dude. |
| [Flores]: | Yeah, you are acting like a fool, and you are looking like one. And we don't like that. |
| [Garza]: | I thought you couldn't stand. I thought you couldn't walk. . . . You look healthy right now. |
| [Flores]: | You're standing and throwing up in the bucket. |
| [Garza]: | And you can hold the bucket and stand? You're a good actor. Ain't nothing wrong with you, you're just putting on a show for everybody. . . . Everything you do from now on, we're going to record it. Anytime you don't listen, we're going to record it. Until you heal up and then you can get spanking again. But from now on, this is what we are going to do. We are going to keep a record of everything that you do, that way people can start realizing how bad you are and how much you don't listen, and how for everybody else, you just put on a show and an act. . . . Now you want to spit up and everything. |

As Dr. Donaruma explained, N.F.'s internal injuries would have caused him "pain," "vomiting," and "[h]e would probably have decreased appetite, if any." "He might get

dehydrated from the [in]ability to either take in or hold down liquid." Dr. Donaruma stated that "[t]his was child torture." She continued:

> With what I saw, based on the videos you showed me and his body and radiology studies, I believe this was ongoing, and I know it started in that September video at least, and then he died in February. . . . Torture is practiced for the purposes of dominance and control to break somebody, their will. . . . Torture is on purpose, with an agenda. It is cruel. It is dehumanizing.

Dr. Donaruma further explained that a person of average or below average intelligence would have noticed N.F.'s injuries.

At the conclusion of the evidence from both sides, the jury returned a guilty verdict, and the trial court imposed a term of life imprisonment without the possibility of parole.[5] This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Garza argues that there was insufficient evidence to sustain his conviction. In particular, he argues that no medical expert testified that Garza caused the death of N.F. Garza does not dispute that blunt force trauma caused N.F.'s death but argues that "there is no competent evidence that was presented to the jury that [Garza] was present in the home at the time the child received the injury that caused his death."

### A. Standard of Review & Applicable Law

"Under the Due Process Clause, a criminal conviction must be based on legally sufficient evidence." *Harrell v. State*, 620 S.W.3d 910, 913 (Tex. Crim. App. 2021) (citing *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015)). Evidence is legally sufficient if "any rational trier of fact could have found the essential elements of the crime

---

[5] Flores was also convicted of capital murder and sentenced to life imprisonment without the possibility of parole. Flores is not a party to this appeal.

10

beyond a reasonable doubt." *Joe v. State*, 663 S.W.3d 728, 731–32 (Tex. Crim. App. 2022) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "For the evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt." *Wise v. State*, 384 S.W.3d 900, 903 (Tex. Crim. App. 2012). Rather, under a legal sufficiency review, we view the evidence in the light most favorable to the verdict, while recognizing that "[t]he trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts." *Joe*, 663 S.W.3d at 732; *see Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (noting that "the reviewing court is required to defer to the jury's credibility and weight determinations"). Further, "[i]t is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (citations omitted). "Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction." *Id*.

We measure the evidence produced at trial against the essential elements of the offense as defined by a hypothetically correct jury charge. *David v. State*, 663 S.W.3d 673, 678 (Tex. Crim. App. 2022) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "A hypothetically correct jury charge 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at

11

240). The "law" as "authorized by the indictment" includes the statutory elements of the offense as modified by the charging instrument. *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

A hypothetically correct charge would instruct the jury that, to convict Garza of capital murder as charged in the indictment, the evidence must establish beyond a reasonable doubt that (1) Garza, either as principal or a party, (2) intentionally or knowingly (3) caused the death of N.F., (4) who was then under ten years of age, (5) by one of the manners and means alleged in the indictment. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(8). As noted, the manners and means alleged in the indictment included "[s]trik[ing] [N.F.] with an object unknown to the Grand Jury" and/or "[a]sphyxiating [N.F.] by a means unknown to the Grand Jury."

## B. Discussion

Garza is mistaken that there was no evidence that he was there on the night N.F. received his fatal injuries. During his pre-arrest interview with police, he affirmed that he was there on the "night of this last incident." He also admitted that he was unemployed and would take care of N.F. when Flores was at work. Garza does not challenge the evidence establishing N.F.'s cause of death, nor even the evidence supporting a finding of child torture. Rather, Garza seems to suggest that the evidence here is insufficient as to capital murder because there was no direct evidence that he inflicted the fatal blow to N.F.

This case presents facts similar to *Lucio v. State*, wherein a mother "was charged with the capital murder of her two-year old daughter, Mariah," but no evidence was presented proving the method of commission of the offense. 351 S.W.3d 878, 880 (Tex.

12

Crim. App. 2011). The indictment alleged only that the mother caused Mariah's death "by striking, shaking, or throwing [the child] with defendant's hand or foot or other object unknown to the Grand Jury." *Id*. at 894. As the Texas Court of Criminal Appeals explained,

> In *Lucio,* we determined that the evidence was legally sufficient to support a conviction for capital murder, even though the defendant admitted only that she struck the two-year-old victim at some time. The evidence indicated that the defendant had the opportunity to inflict the victim's fatal injuries, as she was the victim's primary care-giver, she told police that she spanked or hit the victim several times, and that the victim's father and her older children did not hit the victim. Based on this evidence the jury could infer that defendant caused the victim's fatal injuries despite the fact that the evidence did not prove the method of commission of the offense.

*Ramos v. State*, 407 S.W.3d 265, 271 (Tex. Crim. App. 2013) (cleaned up) (applying *Lucio* in finding sufficient evidence for manslaughter where the only testimony as to cause of death established that "an object struck [victim's] head when her head was stationary").

We conclude that the evidence detailed above was sufficient for the jury to have found Garza guilty beyond a reasonable doubt, either as a principal or a party, notwithstanding a lack of evidence establishing the precise method of commission of the offense. The evidence shows that Garza had the opportunity to inflict N.F.'s fatal injuries and that he was previously involved in abusing N.F., as illustrated vividly in the video wherein he and Flores can be heard scolding a bruised N.F. for throwing up, and Garza can be heard saying that N.F. needs to "heal up" so that he will be healthy enough to be spanked again. Although Garza denied striking N.F., the jury could have reasonably disbelieved his testimony. *See Joe*, 663 S.W.3d at 732.

This conclusion is further supported by evidence that Garza and Flores gave statements to police which defy common sense. According to Garza and Flores, N.F.'s injuries were self-inflicted, and the result of "tantrums" and behavioral issues, none of

13

which were sufficiently severe to warrant medical attention until the day he came to the hospital. A rational trier of fact could have "found that [Garza] was less than truthful about his involvement in the offense when he made [his recorded] statement to the police," and could have considered "such untruthful statements by [Garza], in connection with the other circumstances of the case, as affirmative evidence of [his] guilt." *Padilla v. State*, 326 S.W.3d 195, 201 (Tex. Crim. App. 2010).

In *Padilla*, appellant was convicted of capital murder and gave a statement to police in which he stated that his co-defendant Gonzales murdered the victim alone. *Id*. at 198. According to appellant, he and Gonzales, who owed the victim money, had driven one hour to the victim's house on the day of the murder "[f]or some reason, which appellant did not explain[.]" *Id*. Appellant told police that Gonzales entered the victim's house alone, and then told appellant to come inside, and "[w]hen appellant did so, he saw the victim's body," and "Gonzales told him that he struck the victim in the back of the head with a tire-checker tool." *Id*. at 199. Appellant then helped Gonzales dispose of the evidence and pawned some of the victim's jewelry, which led to his arrest. *Id*.

On appeal, appellant argued that the evidence was insufficient to establish that he murdered the victim, as either a principal or a party, given the lack of physical or direct evidence indicating that he struck the fatal blow, and given his pre-recorded statement to police. *Id*. The Texas Court of Criminal Appeals disagreed, concluding that "a rational trier of fact could have found beyond a reasonable doubt that appellant willingly and actively participated in the victim's murder during the course of a robbery with" Gonzales. *Id*. at 200. After recognizing that there was no direct physical evidence that appellant struck the victim, the court noted that the physical evidence was consistent with two people striking

14

the victim, and the medical examiner's testimony "support[ed] a finding that the victim could have been attacked by two people." *Id*. The Court further noted appellant's culpable behavior after the murder, including pawning some of the victim's jewelry. *Id*. at 200–01.

> In addition, a rational trier of fact could have found that appellant was less than truthful about his involvement in the offense when he made the videotaped statement to the police. A rational trier of fact could have disbelieved appellant's claim that his best friend, Gonzales, would take a completely innocent-bystander witness with him while Gonzales committed a capital murder. *A rational trier of fact could also consider such untruthful statements by appellant, in connection with the other circumstances of the case, as affirmative evidence of appellant's guilt*.

*Id*. at 201 (emphasis added).

Although N.F. was covered with visible injuries, Garza stated that he was unaware of them, including burn marks, and his only explanation for these injuries was that they were self-inflicted. After being informed of N.F.'s extensive internal injuries, including broken bones and lacerated organs, Garza could provide no explanation, stating that "[N.F.] was walking around fine like, there was nothing wrong." Given the other evidence in the case, including the evidence that Garza was frequently N.F.'s sole caregiver and was present on the night in question, and the physical evidence showing child torture, as in *Padilla*, we conclude that a rational trier of fact could have considered Garza's untruthful statements as affirmative evidence of guilt, and "could have found beyond a reasonable doubt that appellant willingly and actively participated in" N.F.'s murder. *Id*. at 200. Here, "the jury's verdict . . . is rationally supported by common sense, logical inferences from the circumstantial evidence, and legally sufficient evidence." *Id*. at 202. We overrule Garza's first issue.

15

### III. ADMISSION OF JAILHOUSE INFORMANT TESTIMONY

By his second issue, Garza argues that the trial court erred in admitting the testimony of a jailhouse informant who was not disclosed before trial. During trial, the State called Walter Ferris as a witness. Ferris testified that he had shared a cell with Garza in the Jackson County Jail and was providing testimony as part of an agreement for leniency. Ferris testified that Garza admitted to being responsible for disciplining N.F. and admitted to spanking N.F. with a belt and cutting board. Garza admitted to Ferris that he had once punched the child so hard that N.F. fell down, and Garza punched him again when he got up. Garza also explained to Ferris that he would sometimes have to "wrestle" N.F. to put him to bed, which involved picking up N.F. and throwing him on his head, and sometimes putting his weight on N.F.'s chest.

At some point during Ferris's testimony, Garza objected to the testimony on the basis that the State violated Texas Code of Criminal Procedure 39.14 by the untimely disclosure of Ferris. The record is unclear as to whether Garza obtained a ruling on this objection. Garza's motion for new trial also argued that the State violated article 39.14 because of its late disclosure, but no hearing was held on the motion.

On appeal, Garza argues that admission of Ferris's testimony was erroneous because of the State's untimely disclosure. Garza roots his argument in the text of article 39.14 of the code of criminal procedure, which provides as follows:

> Notwithstanding any other provision of this article, if the state intends to use at a defendant's trial testimony of a person to whom the defendant made a statement against the defendant's interest while the person was imprisoned or confined in the same correctional facility as the defendant, the state shall disclose to the defendant any information in the possession, custody, or control of the state that is relevant to the person's credibility.

16

TEX. CODE CRIM. PROC. ANN. art. 39.14(h-1).

## A.     Standard of Review & Applicable Law

To preserve a complaint for appellate review, the complaining party must lodge a timely complaint with the trial court that states the grounds for the ruling sought "with sufficient specificity to make the trial court aware of the complaint." TEX. R. APP. P. 33.1. "The purpose of requiring [an] objection is to give the trial court or the opposing party the opportunity to correct the error or remove the basis for the objection." *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) (quoting *Martinez v. State*, 22 S.W.3d 504, 507 (Tex. Crim. App. 2000)). Further, "[t]o preserve error, a party must, among other things, obtain a ruling on the complaint or object to the trial judge's refusal to rule." *Smith v. State*, 499 S.W.3d 1, 5 (Tex. Crim. App. 2016) (citing TEX. R. APP. P. 33.1)).

To preserve error regarding the State's violation of article 39.14, an appellant must request a continuance in the trial court. *Rodriguez v. State*, 630 S.W.3d 522, 524–25 (Tex. App.—Waco 2021, no pet.) (citations omitted). An appellant must likewise request a continuance to preserve a due process complaint based on *Brady v. Maryland*, 373 U.S. 83 (1963). *See State v. DeLeon*, 971 S.W.2d 701, 706 (Tex. App.—Amarillo 1998, pet. ref'd) ("If the State waits until trial before disclosing *Brady* material and the defendant fails to request a continuance, the defendant waives any error resulting from the *Brady* violation." (citations omitted)).

## B.     Discussion

The State argues that Garza failed to preserve error. We agree. Although Garza filed a reply brief, neither in his appellant's brief nor his reply brief does he address the issue of error preservation. Setting aside the form of Garza's objection and whether a

17

ruling was made, because he did not request a motion for continuance, he has failed to preserve any error related to the State's violation of article 39.14. *Rodriguez*, 630 S.W.3d at 524–25.

Further, although Garza states, without explanation, that Ferris's testimony violated certain of his constitutional rights, the alleged violation of his constitutional rights cannot be used to assert a freestanding "fundamental error" claim not subject to the rules of error preservation. *See Proenza v. State*, 541 S.W.3d 786, 793 (Tex. Crim. App. 2017). Accordingly, we overrule Garza's second issue.

### IV. ADMISSION OF GRAND JURY FOREMAN TESTIMONY

In his third issue, Garza argues that the trial court erred in permitting the grand jury foreman to testify. The State called Rodney Roberson, the grand jury foreman, to testify in support of the State's contention that the manner and means of committing the offense were unknown to the grand jury. On appeal, Garza argues that this testimony violated the rules pertaining to the secrecy of grand jury proceedings. *See* TEX. CODE CRIM. PROC. ANN. arts. 20A.202, 20A.203.

### A. Standard of Review & Applicable Law

We review the challenge to the admission of evidence under an abuse of discretion standard. *Montgomery v.* State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or when it acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (citing *Montgomery*, 810 S.W.2d at 380). Therefore, we will uphold a trial court's ruling on admissibility if it is within the "zone of reasonable disagreement." *Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021) (quoting *Powell v.*

18

*State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)).

The trial court's erroneous admission of evidence generally constitutes non-constitutional error. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *see* TEX. R. APP. P. 44.2(b). As such, we must disregard the error unless it affected an appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). A substantial right is affected if the error had a substantial and injurious effect or influence in determining the jury's verdict. *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). Nevertheless, one's substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

When we assess the likelihood that the error adversely influenced the jury, we consider the entire record, including (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating the defendant's guilt, and (4) whether the State emphasized the complained-of error. *Gonzalez*, 544 S.W.3d at 373; *Motilla*, 78 S.W.3d at 355.

**B.    Discussion**

Without considering the complained-of testimony of Roberson, we have already determined that the "nature of the evidence supporting the verdict" and "the existence and degree of additional evidence indicating the defendant's guilt" was sufficient to sustain his conviction. *Gonzalez*, 544 S.W.3d at 373. Given the character of the alleged error and the limited nature of Roberson's testimony, we cannot conclude that his

testimony had a "substantial and injurious effect or influence in determining the jury's verdict," *Schmutz*, 440 S.W.3d at 39, and any error in admitting such testimony was non-constitutional error and must be disregarded. *Gonzalez*, 544 S.W.3d at 373; TEX. R. APP. P. 44.2(b). We overrule Garza's third issue.

## V. SEVERANCE

Garza argues that the trial court erred in denying his pre-trial motion for severance based on alleged prejudice in a joint trial. In the trial court, Garza argued that Flores's statements from her recorded interview would prejudice him. After discussing the fact that Flores denied Garza's involvement, the trial court asked defense counsel, "[d]oes her statement inculpate your client?" Defense counsel responded, "No, it does not, Your Honor." Defense counsel, however, argued that severance was warranted because Flores and Garza had "totally separate" defenses.

### A. Standard of Review & Applicable Law

We review a trial court's ruling on a motion to sever under an abuse of discretion standard. *Garza v. State*, 622 S.W.2d 85, 91 (Tex. Crim. App. [Panel Op.] 1980 (op. on reh'g); *Aguilar v. State*, 39 S.W.3d 700, 702 (Tex. App.—Corpus Christi–Edinburg 2001, pet. ref'd) ("Severance is not a matter of right, but lies within the sound discretion of the trial court unless a joint trial would prejudice a co-defendant as a matter of law." (citation omitted)). Article 36.09 of the code of criminal procedure provides that two or more defendants may be tried jointly unless "upon timely motion to sever, and evidence introduced thereon," the defendant shows a joint trial would be prejudicial. TEX. CODE CRIM. PROC. ANN. art. 36.09. A motion to sever based on unfair prejudice is timely if it is made at the first opportunity or as soon as the unfair prejudice becomes apparent. *See*

20

*Aguilar v. State,* 26 S.W.3d 901, 910 (Tex. Crim. App. 2000). The proponent for severance bears a heavy burden and must show clear prejudice. *See Peterson v. State,* 961 S.W.2d 308, 310 (Tex. App. Houston [1st Dist.] 1997, pet. ref'd).

"To establish prejudice, the defendant must show a serious risk that a specific trial right would be compromised by a joint trial, or that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence, and that the problem could not be adequately addressed by lesser curative measures, such as a limiting instruction." *Qualley v. State*, 206 S.W.3d 624, 636 (Tex. Crim. App. 2006). "[T]he existence of antagonistic defenses [cannot] by itself be sufficient to warrant severance." *Id*. However, a defendant may show prejudice where co-defendants have such "mutually exclusive" defenses that "the jury in order to believe the core of one defense must necessarily disbelieve the core of the other." *Adams v. State*, 180 S.W.3d 386, 400 (Tex. App.—Corpus Christi–Edinburg 2005, no pet.) (citations omitted). However, "[t]he mere allegation that prejudice will result is not evidence of, or a sufficient showing of, prejudice under article 36.09, particularly when the severance is discretionary with the trial judge." *Id*. (citing *Patterson v. State*, 783 S.W.2d 268, 270 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd)).

## B.    Discussion

Although Garza and Flores had separate defenses, the mere fact that their defensive theories may be inconsistent or antagonistic is not sufficient to warrant reversal. *Qualley*, 206 S.W.3d at 636. For example, in *Qualley*, appellant Qualley and her boyfriend, co-appellant Moore, were convicted of the capital murder of Qualley's two-year-old daughter. *Id*. at 626. Both defendants moved for severance, and both argued

21

that their defenses were inconsistent, with Qualley arguing that "her interest and the interest of [Moore] are conflicting." *Id*. at 627. Moore argued that severance was warranted because:

> [Qualley's] position is that she does not know what happened and did not see the events that led up to the death of her child. [Moore] will testify that he did not kill or injure the child, and that the only other person that was present was [Qualley].

*Id.* Based on these allegations, Moore argued that the defendants had "mutually exclusive" defenses warranting severance. *Id*.

The court of appeals concluded that severance was warranted because Moore and Qualley had "mutually antagonistic" defenses, reasoning that "'If the jury were to believe [Moore's] assertions at trial, then [Qualley] committed the offense. This would be antagonistic to her defense that she did not commit the offense and did not fail to protect her child from [Moore].'" *Id*. at 630 (alterations in original). After surveying federal and state law, the Texas Court of Criminal Appeals reversed, and explicitly overruled its prior suggestion that "the existence of antagonistic defenses could by itself be sufficient to warrant a severance." *Id*. at 636. After articulating the proper standard for prejudice, the *Qualley* court concluded that the trial court did not abuse its discretion in denying severance because "Qualley's request for severance was based entirely upon antagonistic defenses, and so her claim fails," and found Moore's claim to fail to the extent based on antagonistic defenses. *Id*. at 637. Based on *Qualley*, we conclude that the trial court did not abuse its discretion in concluding that Garza failed to meet the heavy burden of showing that clear prejudice existed based on putatively antagonistic defenses. *See Garza*, 622 S.W.2d at 91; *Peterson*, 961 S.W.2d at 310; *Qualley*, 206 S.W.3d at 636–37.

22

Garza does not explicitly argue that he and Flores had "mutually exclusive" defenses. *See Adams*, 180 S.W.3d at 400. Although Flores did admit to hitting N.F. in the past and denied Garza's involvement, she and Garza had consistent accounts as to N.F.'s injuries, as they both told law enforcement that N.F.'s injuries were the self-inflicted result of his "tantrums." Further, Garza himself admitted to being at the house on the night N.F. became non-responsive and that he drove Flores and N.F. to the hospital. *See id.* at 403 (finding no abuse of discretion in denying severance where appellant made "inculpatory statements," which were the "crux of the evidence offered in support of the motion to sever," that "place[d] her voluntarily at the crime scene during the murder and behind the wheel of the escape vehicle"). Thus, "[Garza's] participation as a party was apparent from the record before the trial court and, thus, the trial court, in denying the motion to sever, could have reasonably concluded that the defenses were not mutually exclusive." *Id*. Considering the evidence evincing his involvement in the abuse of N.F., we conclude that Garza has failed to show how denial of his motion for severance amounted to an abuse of discretion. *See Rhomer*, 569 S.W.3d at 669; *Inthalangsy*, 634 S.W.3d at 754. We overrule Garza's fourth issue.

## VI.    ARREST AFFIDAVIT

In his fifth issue, Garza argues that the trial court erred in denying his motion to suppress because Garza's arrest warrant lacked probable cause. In his sixth issue, Garza complains that the trial court did not permit his retained expert to testify "in his defense as to whether there was probable cause to arrest [Garza] in the first instance." We consider these issues together.

Garza, in his brief, does not explain how his allegedly illegal arrest affected his

23

substantial rights or otherwise amounted to harm sufficient to warrant reversal. *See* TEX. R. APP. P. 44.2. Rather, he argues only that there was insufficient probable cause to support the arrest warrant in the first instance. This claim has been mooted by the return of indictment in the case. "The return of an indictment establishes probable cause as a matter of law and so renders any appellate challenge on the question of probable cause moot." *Ex parte Cardenas*, 557 S.W.3d 722, 736 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.) (citing *Ex parte Branch*, 553 S.W.2d 380, 381 (Tex. Crim. App. 1977)). Accordingly, we overrule Garza's fifth issue.

Likewise, because Garza's proposed expert testimony pertained only to "whether there was probable cause to arrest [him] in the first instance," his claim arguing that the trial court erred in not permitting his expert to testify also amounts to an "appellant challenge on the question of probable cause," and has been mooted by the indictment. *Id*. We overrule Garza's sixth issue.

## VII.   CONCLUSION

We affirm the trial court's judgment.

L. ARON PEÑA JR.
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
5th day of December, 2024.

24